IN THE UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

NASON HOMES, LLC,

     Plaintiff,

v.

BILLY'S CONSTRUCTION, INC.
d/b/a BILL MACE HOMES, BILL
MACE, individually and KENNETH
FOOTE, individually,

     Defendants.

CIVIL ACTION FILE
NO. 3:14-cv-0566
CHIEF JUDGE HAYNES

## OPPOSITION TO DEFENDANTS BILLY'S CONSTRUCTION, INC. AND BILL MACE'S MOTION TO DISMISS

     Defendants Billy's Construction, Inc. and Bill Mace's (collectively Defendants) have failed to carry their "heavy burden" of showing that Plaintiff Nason Homes committed fraud on the Copyright Office. Therefore, their Motion to Dismiss Count I of Nason Home's Complaint should be denied. Defendants have also failed to show that their infringement began before Nason Homes registered its copyright. Accordingly, this case should proceed with Counts I and III intact against Defendants with Nason Home's having the choice before a final decision is rendered to elect whether to pursue statutory damages or its actual damages and Defendants' profits.

## I.    FACTS

Nason Homes is a residential home construction company which has developed a reputation in Georgia and Tennessee for construction excellence. Dkt. No. 1 at ¶ 1. Throughout the past few years, Nason Homes hired architect John Hemlick of Builders Plan Service LLC to create a number of house plans on behalf of Nason Homes. One of these plans was the Adler Plan. Dkt. No. 1. at ¶¶ 2, 16. At the time Mr. Hemlick designed the Adler Plan it was understood by Nason Homes, Nason Homes' owner Stuart Beattie, Buliders Plan Service, and Mr. Hemlick that the work was a "work for hire" under the Copyright laws and that Nason Homes was the owner of any copyright associated with the Adler Plan.[1] The Adler Plan was just one of the designs that Mr. Hemlick created on behalf of Nason Homes. In August of 2013, the parties entered a *nunc pro tunc* assignment formalizing their earlier oral agreement. The assignment gave Nason Homes all rights in the copyrights for these designs. However, the Adler Plan was inadvertently omitted from this assignment.

Nason Homes, with the understanding that the August 2013 Assignment included all rights to the Adler Plan, registered the Adler Plan with the Copyright Office resulting in Copyright Registration Number VA 1-888-774 with an effective

---

[1] As this is a Motion to dismiss to be decided on the pleadings, Nason Homes does not attach a declaration or other evidence. If the Court wishes such evidence, Nason Homes stands ready to submit a declaration attesting to the facts contained herein.

date of registration of January 23, 2014. The Certificate of Registration correctly lists Mr. Helmick as the author of the work and that the work was a "work for hire." It further correctly lists Nason Homes as the owner of the work. The Registration, however, incorrectly states that the parties had executed a written assignment prior to Nason Homes registering its copyright.

Once Nason Homes realized that the Adler Plan was not included in the earlier, August 2013 Agreement, it promptly entered into a *nunc pro tunc* assignment on February 4, 2014 correcting any deficiency in the earlier oral assignment. Dkt. No. 1, Exhibit A. This *nunc pro tunc* assignment demonstrates that Nason Homes was the owner of all right, title and interest in The Adler design as of January 31, 2012. *See id.*

In January 2014, Nason Homes discovered that Defendants were in the process of building a house, which would, upon completion, infringe Nason Home's copyright in the Adler Plan (the "Infringing House"). In fact, the Infringing House is virtually an exact replica of The Adler. Dkt. No. 1 at ¶ 23.

## II.  ARGUMENT AND CITATION TO AUTHORITIES

Defendants have not shown that Nason Homes committed fraud on the Copyright Office. Specifically, they have not shown that Nason Homes intended to defraud the Copyright Office or that the Copyright Office relied on any misstate by Nason Homes. Defendants have not come close to proving intent instead merely

- 3 -

offering conjecture and speculation.  Such speculation is not sufficient to show fraud on the copyright office.  Thus, it is certainly insufficient to support a Rule 12(b)(6) motion to dismiss for failure to state a claim.

## A. Standard for Motion to Dismiss

The Federal Rules of Civil Procedure provide for liberal pleading polices, requiring only a "short and plain statement" of the claim that gives defendants "fair notice" of the claim and the grounds upon which it rests.  Fed. R. Civ. P. 8.  The complaint's allegations "must be enough to raise a right to relief above the speculative level" and establish a "facial plausibility." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007); *Ashcroft v. Iqbal*, 556 U.S. 662, (2009).

In deciding Defendants' Motion, the Court should "construe the complaint in the light most favorable to the plaintiff, accept all its allegations as true and draw all reasonable inferences in favor of the plaintiff." *Directv, Inc. v. Treesh,* 487 F.3d 471, 476 (6th Cir. 2007).  The court is to decide whether the plaintiff is entitled to relief, not whether the plaintiff can ultimately prove the facts alleged. *See e.g. Schenck v. Orosz,* 109 U.S.P.Q.2d 1099, 1104-1105 (M.D. Tenn 2013) (citing *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 511 (2002).

## B. Copyright Infringement and the Affirmative Defense of Fraud on the Copyright Office

The two elements of copyright infringement are (1) ownership of a valid copyright and (2) copying by defendant. *See e.g., Balsley v. LFP, Inc.,* 691 F.3d

- 4 -

747, 757-58 (6th Cir. 2012) (citing *Bridgeport Music, Inc. v. WB Music Corp.,* 508
F.3d 394, 398 (6th Cir. 2007); *Kohus v. Mariol,* 328 F.3d 848, 853 (6th Cir. 2003).
Copying may be proven by direct evidence or by "showing (1) access to the
allegedly-infringed work by the defendant(s) and (2) a substantial similarity
between the two works at issue." *Kohus,* 328 F.3d at 853-854 (citing *Ellis v.
Diffie,* 177 F.3d 503, 506 (6th Cir.1999)).

A certificate of registration filed within five years of publication of the
copyrighted work "constitutes *prima facie* evidence of the validity of the copyright
and the facts stated in the certificate." 17 U.S.C. § 410 (c). This gives rise to a
presumption of validity, which the defendant must rebut. *Schenck,*109 U.S.P.Q.2d
at 1110.

Fraud on the copyright office is an affirmative defense to copyright
infringement. *See e.g., Varsity Brands, Inc. v. Star Athletica, LLC,* No. 10-2508,
2014 U.S. Dist. LEXIS 26279, *26 n.5 (W.D. Tenn. March 1, 2014)
(characterizing fraud on the copyright office as an affirmative defense) (collecting
cases). To establish fraud on the copyright office, Defendants have the heavy
burden of showing that the copyright registration was factually inaccurate, the
inaccuracies were "willful and deliberate", and that the Copyright Office relied on
those misrepresentations when issuing the registration. *See Schench,* 109

- 5 -

U.S.P.Q.2d at 1110 (citing *Jedson Engineering, Inc. v. Spirit Const. Servs. Inc.*, 720 F. Supp. 2d 904 (S.D. Ohio 2010)).

The Sixth Circuit has made it clear that "an innocent misstatement, or a clerical error, in the affidavit and certificate of registration, unaccompanied by fraud . . . , does not invalidate the copyright, nor is it thereby rendered incapable of supporting an infringement action." *Advisers, Inc. v. Wiesen-Hart, Inc.,* 238 F.3d 706, 708 (6th Cir. 1956). Defendants have failed to provide any evidence that the single mistake regarding the existence of a written agreement in its Copyright Registration was anything other than an innocent misstatement based on a mistaken belief that the parties had already executed a written agreement.[2] Specifically, Defendants have not offered any evidence that the mistake was based on a willful or deliberate intent to mislead the Copyright Office. Thus they have failed to carry their heavy burden of proving fraud on the Copyright Office. *See Schenck,* 109 U.S.P.Q.2d at 1110-1111.

### C. Nason Homes' Complaint Does Not Establish That There Was Fraud On the Copyright Office

Defendants have not shown that the error regarding a written assignment in Nason Homes' Copyright Registration is anything other than an innocent error that does not affect Nason Homes' ownership of the copyright. Moreover, Defendants

---

[2] In fact, given the nature of the *nunc pro tunc* assignment (discussed *infra*), there was no error in the registration.

- 6 -

fail to cite even one case in which dismissal on a 12(b)(6) motion based on alleged fraud on the Copyright Office is appropriate. Indeed, given that the Defendants carry a "heavy burden" to establish fraud on the Copyright Office, it is hardly surprising that there is a dearth of authority for Defendants' position. *See e.g., Sierra-Pascual v. Pina Records, Inc.,* 660 F. Supp. 2d 196, 203 (D.P.R. 2009); *Lennon v. Seaman,* 84 F. Supp. 2d 522, 525 (S.D.N.Y. 2000) .

Instead of citing authority supporting their request that the Court dismiss this case, Defendants speculate that "Plaintiff willfully and deliberately misrepresented its ownership" because the Copyright Act requires a written assignment of a work for hire. Def. Mem. at 5. Requesting the Court to consider a factually intensive affirmative defense on a 12(b)(6) motion to dismiss based on mere speculation is improper. *See e.g., Datastorm Tech., Inc. v. Excalibur Communications, Inc.,* 888 F. Supp. 112, 115 (N.D. Cal. 1995) (denying motion to dismiss based on allegations of fraud on the Copyright Office because of factual nature of allegation). Indeed, such issues as fraud on the copyright office are generally inappropriate even for summary judgment given the highly factual nature of the element of intent. *See e.g., Jedson Eng'g, Inc. v. Spirit Constr. Servs. Inc.,* 720 F. Supp. 2d 904, 914 (S.D. Ohio 2010) (emphasis added) (quoting

*Shady Records, Inc.,* 2004 U.S. Dist. LEXIS 26143, at *35). Defendants have failed to meet their burden of showing intent.

### 1. Plaintiff is the owner of the copyright at issue

==Nason Homes has been the owner of the copyright in the Adler Plan since January 31, 2012.== This is conclusively established by the *nunc pro tunc* assignment attached to the Complaint as Exhibit A. Defendants completely ignore the *nunc pro tunc* nature of the assignment, instead arguing that "Hemlick owned the copyright to the Adler Plan until the February 4, 2014 assignment of the copyright to the Plaintiff." Def. Mem. at 5. This is incorrect as the Assignment attached to the Complaint demonstrates. Dkt. No. 1, Exhibit A.

*Nunc pro tunc* is a "phrase applied to acts allowed to be done after the time when they should be done, *with a retroactive effect.*" Black's Law Dictionary, 6th Edition (emphasis added). Accordingly, the *nunc pro tunc* assignment is a written document demonstrating that Nason Homes was the owner of the copyright as of January 31, 2012, long before it filed for a copyright registration on January 23, 2014. As such, there was absolutely no misstatement in the Copyright Registration regarding ownership of the Adler Plan.

Defendants reliance on 17 U.S.C. §204(a) is misplaced. While § 204 does require that assignments of copyright ownership be in writing, courts have interpreted this requirement liberally.

> Courts have consistently held that subsequently-executed written agreements confirming a prior oral agreement to transfer copyrights are sufficient for the purposes of § 204(a), even when executed after the copyrights have been registered and after a lawsuit has been filed. *See Eden Toys, Inc, supra; X-IT Products, supra; Barefoot Architect, supra; Arthur Rutenberg Homes v. Drew Homes,* 29 F.3d 1529, 1532 (11th Cir. 1994); *Nimmer on Copyrights, supra,* § 10.03[3] (explaining that § 204(a) "apparently codifies the judge-made rule under the 1909 Act that, if a prior oral grant is subsequently confirmed in writing, it validates the grant *ab initio* as of the time of the oral grant").

*Capital Concepts, Inc. v. The Mountain Corporation,* No. 3:11-CV-00036 at 16 (W.D. Va. December 30, 2012) (attached hereto as Exhibit 1). Thus, Nason Homes correctly listed itself as the owner of the work for hire created by Hemlick.

Accordingly, the only error in the Copyright Registration is that there was a written agreement in place at the time of registration. This error is not material, however, as there is no contested issue regarding the true ownership of the copyright as demonstrated by the *nunc pro tunc* assignment. "Material misstatements in a copyright registration application "are those which go toward the registrability of the materials themselves, such as originality ... the nature of materials to be copyrighted ... and *contested* claims of authorship and ownership." *Jedson,* 702 F. Supp. 2d at 914.

The *nunc pro tunc* assignment corrected the oversight. Indeed given
the nature of a *nunc pro tunc* assignment, there was in fact, no error because
the written agreement is effective as of Janurary 2012. Dkt. No. 1, Exhibit
A. Mr. Hemlick created multiple works for Nason Homes. The parties
executed a *nunc pro tunc* assignment on April 3, 2013 for some of these
works. When Nason Homes filed its copyright registration it mistakenly
believed that the Adler Plan was included in this assignment. When it
realized its mistake, the parties executed the *nunc pro tunc* assignment
attached as Exhibit A to the Complaint. Accordingly, even if there were a
mistake in the Copyright Registration, the *nunc pro tunc* assignment proves
that it was not material.

## 2. There is no evidence of fraud

Defendants offer absolutely no evidence of fraud. Instead they *assume* that
Nason Homes knew that there was not a written agreement in place and infer intent
based on this assumption. Based on the assumption that Nason Homes was aware
that it did not have a written assignment, Defendants speculate that Plaintiff
"willfully and deliberately misrepresented" that it was the owner of the copyright
and that there was a written agreement in place. Such assumptions are not
sufficient to show fraud on the copyright office and are especially insufficient to
warrant dismissal of the case on a Rule 12(b)(6) motion. *See e.g., DataStorm,* 888

- 10 -

F. Supp. at 115; *Jedson,* 720 F. Supp. 2d at 916 (S.D. Ohio 2010). Therefore, Defendants Motion to Dismiss should be denied.

### D. Nason Homes' Complaint States a Claim for Copyright Infringement

Defendants hardly question that absent its allegation of fraud, Nason Homes' Complaint meets the standard set forth in *Twombly* and *Iqbal.* The Complaint indisputably meets this standard. Nason Homes' Complaint establishes Nason Homes' right to relieve above a speculative level. Nason Homes has not relied on mere legal conclusions but has alleged specific facts regarding each element of copyright infringement. First, Nason Homes has alleged that it is the owner of the copyright registration for the Adler Plan and attached its Copyright Registration as an Exhibit to the Complaint; therefore establishing the first element of copyright infringement. Dkt. No. 1 at ¶ 2, Exhibit B. Nason Homes has pleaded the second element of copyright infringement by alleging that Defendant Foote "procured the Adler plan and provided it to Defendant Mace Homes and Defendant Mace" and that the Infringing house is substantially similar to the Adler Plan. *See e.g.,* ¶¶ 3, 5, 21, 23, 24, 29-31, and 36. Indeed, Defendants do not seriously contend otherwise.

### E. Nason Homes is Entitled to Statutory Damages, Attorneys' Fees and Costs

The Copyright Act provides that a plaintiff may elect to recover either statutory damages or the plaintiff's actual damages and any additional profits of the defendants at any time prior to final decision in the case. 17 U.S.C. § 504.

Defendants argue that Nason Homes "claim for statutory damages fails" because it received its registration after the Defendants infringed the copyright. However, the Infringing House is still not completed. The pictures attached to the Complaint as Exhibit C demonstrate that the Infringing House was not "almost completed" as Defendants allege. Essentially only the framing had been completed by January when Nason Homes received its copyright. ==Until the Sheetrock is installed, there is always the possibility of inexpensive reconstruction.== The issue of whether the infringement had begun by January 23, 2014 is at least a question of fact inappropriate for determination on a 12(b)(6) motion. *See Guillot-Vogt Assoc., Inc. v. Holly & Smith,* 848 F. Supp. 682, (E.D. La. 1994) (denying Rule 12(b)(6) motion to dismiss claim for statutory damages, costs and attorneys' fees). Accordingly, the Court should deny Defendants' motion to dismiss Nason Homes' claims for statutory damages, attorneys' fees and costs.

### F. The Copyright Act Provides for Increased Damages for Willful Infringement and it is this Provision that is the Basis for Nason Homes Request for Punitive Damages

Nason Homes' request for "punitive" damages relates only to its claim for increased damages based on Defendants' willful infringement. Such damages are plainly allowed by the Copyright Act. The Copyright Act specifically provides for increased statutory damages in the case of willful infringement. 17 U.S.C. § 504(c). Nason Homes has pled that Defendants infringement was willful. *Se e.g.,*

Dkt. No. 1 at ¶ 34.  Accordingly, Nason Homes' claim for increased damages based on willful infringement should not be dismissed.

## III.    CONCLUSION

For the foregoing reasons, Nason Homes respectfully requests that Defendants' Motion to Dismiss be denied.

Respectfully submitted, this 21st day of April, 2014.


**AARON & SANDERS, PLLC**

Richard G. Sanders, Tenn. BPR No. 23875
11 Lea Avenue, Suite 606
Nashville, TN 37210
(615) 734-1188
Fax:  (615) 250-9807
rick@aaronsanderslaw.com


**LILENFELD PC**

*/s/ Sonia F. Lakhany*
David M. Lilenfeld
Georgia Bar No. 452399
Sonia F. Lakhany
Georgia Bar No. 214872
Attorneys for Plaintiff
2970 Peachtree Road, N.W., Suite 530
Atlanta, Georgia  30305
(404) 201-2520 - telephone
(404) 393-9710 - facsimile
David@LilenfeldPC.com
Sonia@LilenfeldPC.com

- 13 -

IN THE UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

NASON HOMES, LLC,

    Plaintiff,

v.

BILLY'S CONSTRUCTION, INC.
d/b/a BILL MACE HOMES, BILL
MACE, individually and KENNETH
FOOTE, individually,

    Defendants.

CIVIL ACTION FILE
NO. 3:14-cv-0566
CHIEF JUDGE HAYNES

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that the foregoing pleading, on the date stated below, was filed with the Clerk of Court using the CM/ECF system, which automatically and contemporaneously sends electronic notification and a service copy of such filing to the following counsel of record:

Robert J. Mendes
Lindsay B. Schenk
Frost Brown Todd LLC
150 3rd Avenue South, Suite 1900
Nashville, Tennessee 37201

Dated:  April 21, 2014.

/s/ Sonia F. Lakhany
*Attorney for Plaintiff*

502 Fed.Appx. 523
This case was not selected for
publication in the Federal Reporter.
Not for Publication in West's Federal Reporter.
See Fed. Rule of Appellate Procedure 32.1
generally governing citation of judicial decisions
issued on or after Jan. 1, 2007. See also
Sixth Circuit Rule 28. (Find CTA6 Rule 28)
United States Court of Appeals,
Sixth Circuit.

William L. JOHNSON, et al., Plaintiffs–Appellants,

v.

Middle METROPOLITAN GOVERNMENT
OF NASHVILLE AND DAVIDSON COUNTY,
TENNESSEE, et al., Defendants–Appellees.

Nos. 10–6102, 11–5174.    |    Oct. 18, 2012.

**Synopsis**
**Background:** Caucasian male police officers brought action
against police department and its former chief, asserting
reverse discrimination claims under Title VII and Tennessee
Human Rights Act (THRA). The United States District Court
for the District of Tennessee, Aleta A. Trauger, J., 2010 WL
3342211, entered summary judgment for department, and
officers appealed.

**Holdings:** The Court of Appeals, Clay, Circuit Judge, held
that:

[1] department's destruction of promotion survey results did
not warrant spoliation sanctions;

[2] department spokesperson's statements about diversity
were not direct evidence of reverse discrimination under Title
VII;

[3] officers failed to establish a prima facie case of reverse
discrimination under Title VII; and

[4] officers failed to state a claim for disparate impact
discrimination.

Affirmed.

West Headnotes (10)

[1] **Federal Civil Procedure**
    👉 Failure to Comply;  Sanctions

    Police department's destruction of promotion
    survey results did not warrant spoliation
    sanctions in police officers' action alleging
    reverse discrimination in violation of Title VII
    and Tennessee Human Rights Act (THRA);
    although department was statutorily obligated to
    preserve surveys and police chief intentionally
    ordered their destruction, surveys were of
    minimal relevance to officers' claims, since they
    consisted only of supervisors' numerical scoring
    of promotion candidates and did not instruct
    supervisors to consider race, gender, or diversity
    in making their decisions. Civil Rights Act of
    1964, § 701 et seq., 42 U.S.C.A. § 2000e et seq.;
    West's T.C.A. § 4–21–101 et seq.

    5 Cases that cite this headnote

[2] **Civil Rights**
    👉 Reverse Discrimination

    Memorandum written by police department's
    deputy chief urging promotion of a group of
    officers that included five minority candidates
    before next slate of officers, which contained
    no minority candidates, became eligible for
    promotion was not direct evidence of reverse
    discrimination in violation of Title VII, since
    deputy chief was not a decisionmaker in
    promotion process. Civil Rights Act of 1964, §
    703, 42 U.S.C.A. § 2000e–2.

    Cases that cite this headnote

[3] **Civil Rights**
    👉 Reverse Discrimination

    Police department spokesperson's alleged
    statements to local newspapers that department
    would consider diversity in making its
    promotion decisions was not direct evidence
    of reverse discrimination in violation of Title
    VII; spokesperson's statements merely reflected
    department's awareness of a lack of minorities

WestlawNext © 2014 Thomson Reuters. No claim to original U.S. Government Works.

within its upper ranks and its desire to improve diversity. Civil Rights Act of 1964, § 703, 42 U.S.C.A. § 2000e–2.

Cases that cite this headnote

**[4]** **Civil Rights**
🔑 Discrimination against men; reverse discrimination

Police department commander's alleged statement that female officers received preferential treatment in department's promotion decisions was not direct evidence of reverse discrimination in violation of Title VII, since commander was not a decisionmaker in promotion process. Civil Rights Act of 1964, § 703, 42 U.S.C.A. § 2000e–2.

2 Cases that cite this headnote

**[5]** **Civil Rights**
🔑 Discrimination against men; reverse discrimination

Evidence that female officers received preferential treatment in police department's promotion process and that police chief was acutely conscious of department's long history of racial and gender imbalance was sufficient to show that department discriminated against the majority, as required to establish a prima facie case of reverse discrimination in violation of Title VII. Civil Rights Act of 1964, § 703, 42 U.S.C.A. § 2000e–2.

2 Cases that cite this headnote

**[6]** **Civil Rights**
🔑 Discrimination against men; reverse discrimination

**Civil Rights**
🔑 Race, color, ethnicity, or national origin

Caucasian male police officers who were passed over for promotion failed to demonstrate that they were similarly situated to minority officers who were chosen for promotion, as required to establish a prima facie case of reverse discrimination in violation of Title VII; officers' survey results fell below line for promotion.

Civil Rights Act of 1964, § 703, 42 U.S.C.A. § 2000e–2.

1 Cases that cite this headnote

**[7]** **Civil Rights**
🔑 Discrimination against men; reverse discrimination

**Civil Rights**
🔑 Race, color, ethnicity, or national origin

Even assuming caucasian male officers established a prima facie case of reverse discrimination against police department under Title VII, they failed to demonstrate that department's proffered legitimate, non-discriminatory reason for denying them promotions, specifically their poor survey results, was mere pretext for discrimination; officers' survey results fell below line for promotion, and minority officers with poor results also were not selected for promotion. Civil Rights Act of 1964, § 703, 42 U.S.C.A. § 2000e–2.

1 Cases that cite this headnote

**[8]** **Federal Civil Procedure**
🔑 Time for amendment

**Federal Civil Procedure**
🔑 Pretrial Order

District court properly denied caucasian male officers' motion to amend their complaint to add allegations of disparate impact discrimination in their action against police department under Title VII; officers failed to show good cause for seeking an amendment more than two months after deadline in court's scheduling order. Civil Rights Act of 1964, § 703, 42 U.S.C.A. § 2000e–2.

2 Cases that cite this headnote

**[9]** **Civil Rights**
🔑 Discrimination against men; reverse discrimination

**Civil Rights**
🔑 Race, color, ethnicity, or national origin

Case 3:14-cv-00566 Document 26-1 Filed 04/28/14 Page 17 of 41 PageID #: 220

Caucasian male officers' allegation that police department ignored objective criteria it gathered from written examinations and assessments in making its promotion decisions because of an intent to discriminate against majority candidates was insufficient to support a disparate impact claim under Title VII; officers' allegation was more akin to a disparate treatment claim. Civil Rights Act of 1964, § 703, 42 U.S.C.A. § 2000e–2.

Cases that cite this headnote

**[10]    Civil Rights**
👉 Costs
**Civil Rights**
👉 Taxation

Police chief was not required to file a separate bill of costs from police department, which paid his legal fees, in order to be awarded attorneys' fees and costs as a prevailing party in caucasian male officers' action alleging reverse discrimination in violation of Title VII. Civil Rights Act of 1964, § 703, 42 U.S.C.A. § 2000e–2; Fed.Rules Civ.Proc.Rule 54(d)(1), 28 U.S.C.A.

Cases that cite this headnote

**\*525** On Appeal From The United States District Court For The District Of Tennessee.

BEFORE: CLAY and KETHLEDGE, Circuit Judges; DOW, District Judge. \*

**Opinion**

CLAY, Circuit Judge.

Plaintiffs William L. Johnson, Julian W. Moore, and Keith M. Holley, police officers employed by Defendant Metropolitan Police Department ("MNPD") of Nashville, Tennessee, appeal the district court's grant of summary judgment on Plaintiffs' reverse discrimination claims. Plaintiffs were passed over for promotion as a result of a departmental policy that they allege favored minority and female candidates. They sued Defendants MNPD; Metropolitan Government of Nashville and Davidson County ("Metro"); MNPD's

former chief, Ronal W. Serpas; and other MNPD personnel, alleging violations of 42 U.S.C. § 1983; Title VII of the 1964 Civil Rights Act, 42 U.S.C. § 2000e; and the Tennessee Human Rights Act ("THRA"), Tenn.Code Ann. §§ 4-21-401–4-21-408. The district court dismissed several of Plaintiffs' claims and, after the parties conducted discovery, granted Defendants' motion for summary judgment. Plaintiffs now appeal that judgment, several evidentiary rulings, and the district court's decision to tax costs against them. For the reasons that follow, we **AFFIRM** the district court's judgment in all respects.

**BACKGROUND**

**I. The MNPD Promotion Policy**

Prior to 2006, it was MNPD's policy to promote officers strictly through the use of standardized tests. An officer applying for a promotion completed a written civil service examination and took part in a performance assessment designed to evaluate the officer's skills and leadership ability. The score received by the officer on each examination was combined into a composite score. The candidates were ranked according to their composite scores, and the departmental chief was required to promote the officers according to ranking, even if the chief believed that a lower-ranked officer was more qualified than a higher-ranked officer.

This policy was the target of criticism in some corners. For one, an outside consultant performed an audit of the MNPD in 2002 and concluded that this method of promoting officers failed to take important criteria into consideration, such as each candidate's managerial skill and past performance. There was also concern about whether the policy inhibited minority candidates from earning promotions, an issue that the local media reported in news articles around 2003. In addition, there was a broader concern internally about the diversity of the MNPD's ranks. For example, Metro and MNPD officials complained to the attorney who represented the police officers union about a lack of diversity in the police force's upper ranks during a meeting regarding negotiations on changes to the promotion policy. These officials **\*526** theorized that the testing scheme exacerbated the problem.

Well before changes were implemented to MNPD's testing system, MNPD officials made other attempts to increase the department's racial diversity. In December 2003, Deputy Chief Anderson wrote a memorandum to acting Chief of Police Deborah Faulkner urging her to promote fifteen

officers to the rank of sergeant before the current slate of officers eligible for promotions expired on January 9, 2004 (the "Anderson memo"). According to the memorandum, the current slate of fifteen officers included five minority candidates, but the upcoming list did not include a single minority officer. As the memorandum further explained, because a list of candidates was effective for several years, and because minority candidates reached the candidate list in lower numbers than white candidates under the test-based promotions policy, it would be impossible for minority candidates to be promoted if they were not selected from the current slate. Faulkner announced the promotion of several officers shortly after the date of the memorandum, and the group included several minority candidates.

Against this background, MNPD's promotion policy underwent significant change in 2004. Defendant Ronal W. Serpas, who was hired as the MNPD's permanent chief in 2004, shared the prevalent concerns about the test-based promotion policy's soundness. He and Metro's Human Resources Department ("Metro HR") recommended changing the policy, which the Metropolitan Civil Service Commission ("the Commission") did in 2006. Metro hired an outside contractor to design and implement a new policy to replace the test-based promotion policy.

The new policy continues to feature standardized tests, but now also gives the police chief a measure of discretion in deciding whom to promote. Under the new policy, officers must still complete the written civil service examination and skills and leadership assessment. The test results are again combined into a composite score, with the assessment counting for 80% of a lieutenant candidate's score, and 70% of a sergeant candidate's score. The candidates are then ranked according to their scores.

However, under the new policy, when the chief prepares to promote an officer, he is given an eligibility roster that lists the seven highest-scoring candidates eligible for promotion to the rank of lieutenant or lists the nine highest-scoring candidates eligible for promotion to sergeant. The roster does not rank the candidates according to their composite scores. Rather, the roster simply lists the officers' names in alphabetical order and does not reveal their scores. Each officer on the list is considered equally qualified for promotion. The chief is not restricted in choosing among candidates from the list. If the chief has multiple vacancies to fill, he can fill them entirely from the roster given to him. If, however, the chief finds that none of the candidates are

suitable for promotion, he may also choose to promote none of them, and he may instead request a new roster with the next tier of candidates. If the chief obtains another roster, the Commission removes the names of the candidates not selected and then adds the next highest-scoring candidates.

## II. The Disputed Promotions

This litigation concerns several lieutenant and sergeant vacancies that became available during 2006 and 2007. Plaintiffs Johnson and Moore applied for promotions to lieutenant, and Plaintiff Holley applied to become a sergeant. Each officer was passed over and now contends that considerations of race and gender improperly affected Serpas' promotion decisions.

*527 Serpas made his selections in three separate rounds between October 2006 and May 2007. Moore's composite test score ranked him seventh overall, and therefore his name appeared on the first roster submitted to Serpas. Moore was not selected, in spite of the fact that a commander allegedly invited Moore to a meeting of higher-ranked officers under the expectation that Moore would be promoted. Johnson was ranked ninth among the candidates and was therefore not on the first roster given to Serpas. Johnson's name appeared on the second roster that was submitted to Serpas, and Serpas did not select Johnson for promotion. According to Johnson and Moore, three female candidates and two black male candidates ranked lower than them were selected instead. Moore and Johnson contend that only race and gender can account for the fact that these candidates were selected in front of them. Defendants note, however, that three white male candidates who ranked below both Moore and Johnson also were selected for promotion.

For his part, Holley was ranked as a "police officer II" and applied to become a sergeant around the same period. Serpas made selections for the sergeant positions in three separate rounds between February and September 2007. Like Johnson, Holley was not on the first roster submitted to Serpas, because Holley's composite test score ranked him sixteenth among the sergeant candidates. In his affidavit testimony, Holley asserted his name eventually moved up into the roster for promotion, but that twenty-nine officers were eventually promoted to sergeant instead of him. Holley does not allege how many female and black male officers were promoted in front of him, but he contends that the highest-ranked black male officer in the initial rankings was ranked tenth and that the next-highest-ranked black male officer was ranked lower than twentieth. In their defense, Defendants assert that Serpas

WestlawNext

promoted eleven white males who obtained composite scores lower than Holley and declined to promote one white female who scored below Holley.

Plaintiffs nonetheless contend that Serpas and other MNPD supervisors abused the discretion granted them under the new promotion policy in order to favor promotions of minority and female candidates. In support of their contention, they cite, in addition to Serpas' selections noted above, several statements that MNPD officials made to local newspapers. For example, MNPD spokesperson Dan Aaron explained the department's rationale for the changes to the promotion policy to *The Tennessean* in October 2006. The article stated:

Promoting the best candidates possible was the priority, and the chief was pleased there were diverse candidates to pick from near the top of the list, Aaron said.

"The goal of this police department is to mirror the population of the city to the greatest extent possible," Aaron said. "When presented with the opportunity to promote bright, qualified minority candidates, you always give those persons consideration."

*The Tennessean* wrote another article about the promotions in April 2007, this time emphasizing non-minority officers' complaints about the policy. Aaron was again quoted, this time saying, "[i]f you have two candidates who are essentially equal and believe that both would make very good supervisors, and if your choice is to make the department more diverse, you would probably elect to include diversity in your choice." In an article from another local news agency, Aaron was quoted as saying that MNPD changed its promotion policy in order to increase diversity among MNPD leadership.

## *528 III. The Anonymous Supervisor Surveys

According to Plaintiffs, their claims of reverse discrimination gain further support by Serpas' decision to use anonymous surveys completed by the candidates' supervisors as part of his selection process. At some point in 2006 or 2007, Serpas directed Eric Cardinal, an MNPD technology analyst, to develop a computer-based survey for department supervisors to fill out in order to report their assessments of the various lieutenant and sergeant candidates. As we explain below, Cardinal developed the program and disbursed it digitally to the supervisors, who completed the surveys prior to each round of promotions. Serpas used the surveys as part of his decision about whom to promote. While the instructions for the surveys are in the record, the surveys themselves are not available to us, because Serpas directed Cardinal to dispose of them once Serpas was finished using them. Plaintiffs contend that in allowing the surveys to be deleted, Defendants violated federal law and breached their discovery obligations. Upon learning of the destruction of the surveys, Plaintiffs moved for a default judgment or, alternatively, a negative inference against Defendants. The district court denied both requests.

Cardinal described the survey in his deposition testimony. Cardinal sent an email to the appropriate supervisors that contained an internet link, which, when clicked, opened a page on the MNPD's intranet. The supervisor was directed to fill in the log-in information and was then given a set of instructions (which are contained in the record). The supervisor then arrived at the survey form, titled "Promotion Readiness and Potential Ratings for Sergeant Candidates," with the lieutenant survey accompanied by a similar title. The survey form explained that the survey's purpose was "to seek the opinions of supervisory and management personnel who have worked directly with, or otherwise have personal awareness of the skills, abilities, and knowledge possessed by, candidates eligible for promotion to the rank of Sergeant [and Lieutenant] as to their overall readiness and skill." The instructions directed the supervisor to "consider the candidate's potential to lead, manage resources, and successfully perform the duties that he or she will be required to perform."

The supervisor was then asked to rate each candidate in several categories on a scale of 1 to 3, with 1 standing for "lowest potential" and 3 standing for "highest potential." In the interest of creating a spread in the candidates' scores, the supervisor was only allowed to award a certain number of 3, 2, and 1 rankings. The supervisor was instructed not to complete a survey for a candidate with whom he was not sufficiently acquainted. When the supervisor completed the survey, the computer program added his ratings to those of other supervisors regarding a particular candidate. When all the supervisors had completed their surveys, the computer program generated an average score for that candidate, referred to by the parties as a "rollup" score. Supervisors at and above the rank of lieutenant completed surveys for the lieutenant candidates, and supervisors at and above the rank of sergeant completed surveys for the sergeant candidates.

After the supervisors completed each round of surveys, Serpas examined each candidate's rollup score. The rollup score showed each candidate's name, the number of

WestlawNext © 2014 Thomson Reuters. No claim to original U.S. Government Works.

supervisors who rated him, and the candidate's raw and average scores. After Serpas examined the rollups, Cardinal deleted the data and notified Serpas that he had done so. Cardinal could have designed the program to save the data, but **\*529** Serpas did not direct him to do so. Serpas did, however, save the rollup scores for each candidate, and Defendant turned that evidence over to Plaintiffs during discovery.

In his deposition testimony, Serpas testified that he requested the computerized survey because he had not personally met many of the promotion candidates in his three years of leading the MNPD. He testified that he made his promotion decisions after considering the candidates' employment, sick leave, and disciplinary records; their assignment positions; their educational and training experiences; and any citizen complaints filed against them. According to Serpas, the surveys added to the pool of information he used in his selections, and their simplified format allowed him to avoid the time required to personally interview each supervisor about each candidate. Serpas did not keep any notes documenting his promotion decisions. As Plaintiffs point out, the personnel files Serpas consulted disclosed the race and gender of each candidate. Nevertheless, Serpas testified that race and gender played no part in his decision and that he chose other candidates over Plaintiffs because he decided those candidates "were more likely to be successful" than Plaintiffs.

As a general matter, Serpas did not promote any candidate with an average rollup score below 2.0, and each Plaintiff in the instant case scored below that threshold on each of the three supervisor surveys conducted on their performance. Moore received average scores of 1.58 from twelve supervisor surveys in the first round, 1.59 from seventeen supervisor surveys in the second round, and 1.61 from eighteen supervisors in the final round. Johnson received average scores of 1.56 from sixteen supervisors in the first round, 1.58 from twelve supervisor surveys in the second round, and 1.67 from twelve supervisor surveys in the third round. Holley was scored on only two rounds of surveys, and in both rounds thirty-three supervisors scored him for scores of 1.42 and 1.70. These scores placed each Plaintiff near the bottom of their candidate pools.

Nevertheless, Plaintiffs offer several reasons for which they believe that Serpas' use of the surveys was improper. First, Plaintiffs allege that they were not made aware that the surveys would be used as a basis of Serpas' decision, and they

argue that it was unfair for Serpas to use the procedure when it had not been disclosed to the candidates. Plaintiffs also consider it improper that a different number of supervisors rated them during each round of surveys. In response, Defendants contend that this inconsistency was actually a virtue of the surveys, because, in their view, it demonstrates that the supervisors followed the survey directions not to rate the candidates with whom they were unacquainted. Finally, Plaintiffs contend that Serpas used the surveys as a subterfuge to favor minority and female candidates, and they argue that he allowed Cardinal to destroy the surveys in order to hide the department's reverse discrimination.

### IV. Plaintiffs' Meetings with their Supervisors and Human Resources

After Serpas made his selections, Moore, Johnson, and Holley sought explanations for their non-promotion from department officials. Moore and Johnson met separately with MNPD Deputy Chiefs Steve Anderson, Honey Pike, and Joseph Bishop. In his meeting, Johnson asked the deputy chiefs what information the department used to decide whom to promote. The deputy chiefs told him generally that they used many types of information. Johnson asked the panel whether his work history was used in the decision, and **\*530** he asserts that Deputy Chief Anderson answered in a manner suggesting that he did not know whether that information was considered. Johnson told the panel that he believed he was the victim of reverse discrimination and asked the deputy chiefs to investigate his complaint, but he alleges that the deputy chiefs never did so.

Johnson also spoke with other MNPD officials and purportedly received information that supported his view that female and minority candidates received favorable treatment. He spoke with a commander who allegedly told him that "diversity issues needed to be dealt with" in the promotions process. Johnson also spoke with an official within Metro HR. When Johnson asked the official whether the candidates' race and gender affected the promotions decision, the official allegedly answered, "We all know what happened, if you know what I mean."

Moore also discussed his complaint with the deputy chiefs and recorded his conversation. Moore repeatedly raised the issue of race and its effect on the promotions decision, in response to which Deputy Chief Pike conceded that MNPD did not reflect the community's racial and gender diversity. However, Deputy Chief Pike also insisted that the promotion policy was aimed at identifying the most qualified candidates,

WestlawNext

regardless of minority status. According to Moore, Deputy Chief Pike urged Moore to examine his own performance, evaluate whether he deserved a promotion, and discuss his performance with his direct supervisors. Moore told the deputy chiefs that he had done so and concluded that he possessed the qualities required to serve as a lieutenant. Like Johnson, Moore expressed his belief that he was the victim of reverse discrimination, but the deputy chiefs allegedly did not investigate the complaint.

Finally, Holley discussed his failure to earn a promotion with the three deputy chiefs as well. According to Holley, none of the deputy chiefs offered him useful information about why he was not promoted. Holley explained that his direct supervisor urged him to reapply for a promotion. He also said that he was more involved in community affairs than other officers and was often approached by other officers for answers about departmental policy and the law. Nevertheless, according to Holley, the deputy chiefs simply gave him a piece of paper listing thirty-three names with his name thirty-second among the list.

## V. Procedural History

Dissatisfied with the department's promotion decisions, Plaintiffs filed two separate suits in federal district court. Johnson and Moore sued in September 2007, alleging violations of the Equal Protection Clause of the United States Constitution, 42 U.S.C. § 1983, and the THRA. After Johnson and Moore received right-to-sue letters from the Equal Employment Opportunity Commission, they added claims of disparate impact and disparate treatment under Title VII. For his part, Holley filed a similar suit in January 2008, though his complaint contained no Title VII claims, and he did not sue the MNPD. The district court eventually consolidated the cases.

Defendants Pike, Bishop, Anderson, and MNPD filed successful motions to dismiss and all claims against them were dismissed on May 13, 2008.[1] *See Johnson v. Metro.* **\*531** *Gov't of Nashville & Davidson Cnty., Tenn.,* Nos. 3:07–0979, 3:08–0031, 2008 WL 2066475 (M.D.Tenn. May 13, 2008) ("*Johnson I* "). Plaintiffs do not appeal those rulings.

Shortly thereafter, Metro filed a separate motion to dismiss Johnson and Moore's disparate impact claim.[2] (RE 68, Mot. to Dismiss.) Plaintiffs filed a response and also sought leave to amend their complaint. The district court denied Plaintiffs'

motion and dismissed the disparate impact claim. *Johnson v. Metro. Gov't of Nashville & Davidson Cnty.,* Nos. 3:07–0979, 3:08–0031, 2008 WL 3163531 (M.D.Tenn. Aug. 4, 2008) ("*Johnson II* ").

Following those rulings, Plaintiffs' remaining claims asserted that Metro and Serpas violated the Equal Protection Clause and Defendants' rights as protected by Title VII and the THRA. Defendants moved for summary judgment in June 2010. During the same month, Plaintiffs moved for a default judgment or, alternatively, for an adverse finding against Defendants, based upon Defendants' failure to completely preserve the records from the supervisor surveys.

On August 24, 2010, the district court denied Plaintiffs' motions for a default judgment and an adverse factual finding, granted summary judgment in favor of Defendants, and entered judgment on all claims in favor of Metro and Serpas. *Johnson v. Metro. Gov't of Nashville,* Nos. 3:07–0979, 3:08–0031, 2010 WL 3342211 (M.D.Tenn. Aug. 24, 2010) ("*Johnson III* ").

In November 2010, the clerk of the court taxed costs against Plaintiffs. The clerk awarded to Metro the costs of defending both Metro and Serpas. Plaintiffs challenged the clerk's taxation of costs, but the district court upheld the award. *Johnson, et al. v. Metro. Gov't of Nashville,* Nos. 3:07–0979, 3:08–0031, 2011 WL 166320 (M.D.Tenn. Jan. 18, 2011) ("*Johnson IV* ").

Plaintiffs timely appealed the district court's rulings. Original jurisdiction exists pursuant to 28 U.S.C. §§ 1331 and 1367. This Court exercises jurisdiction pursuant to 28 U.S.C. § 1291.

## DISCUSSION

## I. Spoilation of Evidence

Before addressing the merits, we turn first to Plaintiffs' claim that the district court erred in refusing to impose sanctions against Defendants for spoilation of evidence. Plaintiffs contend that they are entitled an inference of discriminatory animus or to a directed verdict because Defendants failed to preserve the individual results of the supervisor surveys and thereby purposefully deprived Plaintiffs of valuable information supporting their claims of reverse discrimination.

This Court reviews a district court's decision regarding spoilation of evidence for abuse of discretion. *Beaven v. U.S. Dep't of Justice,* 622 F.3d 540, 553 (6th Cir.2010) (citing *Adkins v. Wolever,* 554 F.3d 650, 652 (6th Cir.2009) (en banc)). Federal law governs the determination of whether spoilation sanctions are appropriate. *Adkins,* 554 F.3d at 652. A proper spoilation sanction serves both fairness and punitive functions. *Id.* To accomplish these goals, a district court has "broad discretion" to order sanctions it deems appropriate, including dismissing the case, granting summary judgment, or imposing an adverse inference based on the lost or destroyed evidence. *Id.* Recently, this Court articulated a three-part standard for determining whether sanctions are appropriate:

> [A] party seeking an adverse inference instruction based on the destruction of evidence must establish (1) that the party **\*532** having control over the evidence had an obligation to preserve it at the time it was destroyed; (2) that the records were destroyed "with a culpable state of mind;" and (3) that the destroyed evidence was "relevant" to the party's claim or defense such that a reasonable trier of fact could find that it would support that claim or defense.

*Beaven,* 622 F.3d at 553 (quoting *Residential Funding Corp. v. DeGeorge Fin. Corp.,* 306 F.3d 99, 107 (2d Cir.2002) (citation omitted)).

In applying this three-part standard, we explained that the obligation element is met where a defendant knows evidence might be relevant to future potential litigation. *Id.* Where, however, there is no notice of potential litigation, there is less cause to believe the evidence was destroyed intentionally or with the intent to cover up incriminating information. *See id.* Nevertheless, we also noted that the "culpable state of mind" element may be satisfied by showing only that "the evidence was destroyed 'knowingly, even if without intent to breach a duty to preserve it, or negligently.'" *Id.* (internal citation, brackets, quotations omitted).

 [1]   In the instant case, Plaintiffs argue that Metro was obligated to preserve the individual survey results scored by each supervisor, in addition to the averaged rollup scores. Plaintiffs cite several regulations promulgated by the Equal Employment Opportunity Commission ("EEOC") and pursuant to Title VII that obligate employers to preserve employment "records." *See* 42 U.S.C. §§ 2000(e) 8, 2000(e) 12; 29 C.F.R. § 1602.31. Defendants counter that employers are not required to keep every single piece of paper created during the employment process, *see Rummery v. Ill. Bell Tel.*

*Co.,* 250 F.3d 553, 558 (7th Cir.2001), and that the rollup scores were sufficient to satisfy their statutory preservation obligations.

We agree with the district court that Defendants ought to have preserved the individual survey scores. The surveys were part of, and indeed played an integral role in, a significant change to an already controversial promotion system. Whether through formal litigation or otherwise, it was reasonably foreseeable that Defendants would face some sort of challenge to the new promotions system. Defendants should have anticipated that officers who were passed over for promotion might question that decision and that Defendants would need to defend their selections. By deleting the individual surveys, Defendants also deprived the officers of valuable information regarding their individual performance, their likelihood for future promotion, and information that might have been used in litigation. Regardless of whether the rollups were the most efficient way for Serpas to review the survey results, the individual scores had value warranting their preservation beyond his decision-making process.

Furthermore, Defendants were statutorily obligated to preserve the surveys under EEOC and Title VII regulations. The individual surveys are more properly viewed as records in and of themselves, rather than the "rough drafts" or "processes" used to create a final employment record. *See id.* at 558. Finally, it was technologically and logistically feasible to retain the survey data, and Defendants have provided no convincing explanation for why they failed to do so.

Having determined that Defendants were obligated to preserve the surveys, the next question is whether Defendants destroyed the evidence with requisite culpable state of mind. Plaintiffs contend that this element is satisfied because the records were destroyed "knowingly" or "negligently" even if the Chief acted "without [the specific] intent to breach [his] **\*533** duty" to preserve. *See Beaven,* 622 F.3d at 553. The district court rejected this argument, reasoning that Plaintiffs could not show that Serpas "acted in bad faith." *Johnson III,* 2010 WL 3342211, at * 19.

The district court erred by injecting a bad faith component into its spoilation analysis. In *Adkins,* we recognized that there may be a "continuum of fault ranging from innocence through the degrees of negligence to intentionality." 554 F.3d at 652–53. To the extent bad faith is relevant in a spoilation decision, its most appropriately taken into consideration when adjusting the sanction imposed. In the instant case, the

WestlawNext © 2013 Thomson Reuters. No claim to original U.S. Government Works.

record shows that Serpas deliberately chose not to preserve the results and deliberately ordered the destruction of the individual surveys. Although there is no evidence to show that he acted out of bad faith, his conduct was nevertheless intentional and therefore meets the "culpable state of mind" element.

Finally, Plaintiffs must prove that the destroyed surveys are "relevant" to their claims of reverse discrimination. This, however, is where Plaintiffs' request for sanctions must fail. The information Plaintiffs wishes was preserved is of minimal relevance to proving their case for reverse discrimination. First, the surveys themselves were a rather blunt instrument for measuring the supervisors' opinions. The individual results would have consisted only of a string of each supervisor's scoring, rated on a simple 1–to–3 scale, based on instructions which asked the supervisors to take into account a host of qualities demonstrating promotional readiness. The instructions did not tell the supervisors to consider race, gender, or diversity, and to the extent that such motives improperly influenced the scores, they likely would not be immediately apparent from the surveys' simplistic numerical system.

In order to link discriminatory intent to the surveys, Plaintiffs would have to examine each supervisor's rankings for patterns of race or gender discrimination. However, the record does not indicate that the program was enabled in such a way as to accomplish this. Although the supervisors used a log-in "name" and password to access the surveys, the record is unclear as to whether the supervisor's identity was saved alongside with the survey results. Moreover, even if that information was available, multiple inferences would be required to connect the individual surveys relevancy to Plaintiffs' claims. Plaintiffs would need to demonstrate not only an individual supervisor's pattern of discrimination, but also that the pattern of discrimination adversely affected the aggrieved candidate's averaged scores in comparison to his minority counterparts, and by consequence, Serpas' evaluation of the rollup scores. These serious hurdles attenuate the surveys from the ultimate promotion decision at multiple levels. As the proximate causation of the surveys weakens, so does their relevance. Moreover, as we mentioned above, Plaintiffs scored significantly below their promoted counterparts on the supervisor surveys. Accordingly, the likelihood that one or several supervisors' improper discrimination materially altered Plaintiffs' rollup scores is even less likely. The only other way Plaintiffs can conceivably prove the surveys' relevance is by claiming that

the rollups were fabricated. Plaintiffs do not seriously press this argument. [3]

**\*534** Consequently, the district court did not abuse its discretion in denying sanctions.

## II. Reverse Discrimination Claims

### A. Standard of Review

We review a district court's grant of summary judgment *de novo. Wuliger v. Mfrs. Life Ins. Co.,* 567 F.3d 787, 792 (6th Cir.2009). Evidence in the record is viewed in the light most favorable to the nonmoving party, with all reasonable inferences drawn to that party's benefit. *Combs v. Int'l Ins. Co.,* 354 F.3d 568, 576–77 (6th Cir.2004) (citing *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 157, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970)). Summary judgment is appropriate only where the evidence raises no genuine issues of material fact "such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

### B. Statutory Framework

Title VII makes it unlawful for an employer "(1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin; or (2) to limit, segregate, or classify his employees or applicants for employment in any way which would deprive or tend to deprive any individual of employment opportunities" on account of one of the same five grounds listed above. 42 U.S.C. § 2000e–2. There are two principal and distinct means of proving employer discrimination under Title VII: disparate treatment and disparate impact. *Griggs v. Duke Power Co.,* 401 U.S. 424, 431, 91 S.Ct. 849, 28 L.Ed.2d 158 (1971). We address Plaintiffs' claims of disparate treatment first.

### C. Disparate Treatment Claims

#### 1. Direct Evidence of Reverse Discrimination

Plaintiffs first contend that they offered direct evidence of discrimination proving that they were treated disparately from their minority counterparts. Specifically, Plaintiffs cite to (1) the 2003 Anderson memo; (2) Aaron's public remarks to

WestlawNext © 2014 Thomson Reuters. No claim to original U.S. Government Works.

9

*The Tennessean;* and (3) the comments made by Commander Nash, Deputy Chief Pike, and Metro HR representative Sinor in their meetings with Plaintiffs.

Direct evidence "is that evidence which, if believed, requires the conclusion that unlawful discrimination was at least a motivating factor in the employer's actions." *Amini v. Oberlin Coll.,* 440 F.3d 350, 359 (6th Cir.2006); *Grizzell v. City of Columbus Div. of Police,* 461 F.3d 711, 719 (6th Cir.2006) (quoting *Kocak v. Cmty. Health Partners of Ohio, Inc.,* 400 F.3d 466, 470 (6th Cir.2005)). Direct evidence must prove not only discriminatory animus, but also that the employer actually acted on that animus. *See Amini,* 440 F.3d at 359. For the following reasons, none of Plaintiffs' proposed evidence meets this standard.

[2] The Anderson memo does not constitute direct evidence because it would require multiple inferences to reach a finding of discrimination. First, the memo is three years removed from the events of this case, and from it we would need to infer that Anderson's opinions in 2003 motivated his actions in 2005–2006. *See, e.g., Phelps v. Yale Sec., Inc.,* 986 F.2d 1020, 1025–26 (6th Cir.1993) (rejecting statements made about the plaintiff nearly a year prior to his layoff). Additionally, Deputy Anderson was not the decisionmaker in the promotions process. Rather, Serpas was responsible for the disputed promotions, and Deputy Anderson only participated in the process by completing **\*535** supervisor surveys. *See Smith v. Leggett Wire Co.,* 220 F.3d 752, 759 (6th Cir.2000) ("Statements by nondecisionmakers cannot suffice to satisfy the plaintiff's burden of demonstrating animus.") (quoting *Price Waterhouse v. Hopkins,* 490 U.S. 228, 277, 109 S.Ct. 1775, 104 L.Ed.2d 268 (1989) (O'Connor, J., concurring) (internal quotations omitted)).

[3] Next, Plaintiffs point to several statements allegedly made by MNPD spokesperson Don Aaron to local newspapers in 2006 and 2007. Aaron was quoted as stating, "If you have two candidates that are essentially equal and believe that both would make very good supervisors, and if your choice is to make the department more diverse, you would probably elect to include diversity in your choice." Aaron was also quoted as saying, "The goal of this police department is to mirror the population of the city to the greatest extent possible.... When presented with the opportunity to promote bright, qualified minority candidates, you always give those persons consideration."

The district court disregarded these statements as inadmissible hearsay. Plaintiff contends that the district court's evidentiary ruling was incorrect because Aaron's comments should have been considered a statement by a party-opponent. *See* Fed. R. Evid. 801(d)(2)(A) (a "party's own statement in either an individual or a representative capacity" is not hearsay if "offered [against] the party").

We need not consider the district court's evidentiary ruling, because even if admissible, Aaron's statements are not direct evidence of discrimination. Aaron's first statement-answering a hypothetical question about "equally qualified candidates"—requires an inference because the statement did not refer to this employment decision.

Nor is Aaron's second comment direct evidence of discrimination, because it would require us to ignore the equally available inference that the department was simply aware of a lack of minorities within its upper ranks. As we have held, however, statements reflecting a desire to improve diversity do not equate to direct evidence of unlawful discrimination. *See Plumb v. Potter,* 212 Fed.Appx. 472, 477–78 (6th Cir.2007) ("[A] jury could find that [the employer] believed it was good to have more women working at the [company], yet still conclude that [the decisionmaker] did not let that personal belief interfere with her decision whether or not to promote a woman over [the plaintiff].")

[4] Finally, the statements allegedly made by Commander Nash, Deputy Chief Pike, and HR representative Sinor do not constitute evidence of direct discrimination because there is no evidence to show that these individuals were decisionmakers in the promotion process. *See Smith,* 220 F.3d at 759–60. Plaintiffs' attempt to raise a cat's-paw argument about these individuals is also ineffective, because it would require us to draw inferences that are inappropriate under direct discrimination analysis. [4] *See Ercegovich v. Goodyear Tire & Rubber Co.,* 154 F.3d 344, 355 (6th Cir.1998). Accordingly, Plaintiffs have failed to produce direct evidence of reverse discrimination.

### 2. Circumstantial Evidence of Reverse Discrimination

Because Plaintiffs cannot prove reverse discrimination by way of direct evidence, they must rely on circumstantial evidence. **\*536** This Circuit applies a modified version of the *McDonnell Douglas* framework in reverse discrimination cases. *See Leadbetter v. Gilley,* 385 F.3d 683, 690 (6th

WestlawNext

10

Cir.2004) (citing *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973)). Claims of reverse employment discrimination brought under the THRA also apply our modified *McDonnell Douglas* standard. *See, e.g., Newman v. Federal Express Corporation,* 266 F.3d 401, 406 (6th Cir.2001).

First, Plaintiffs must present a *prima facie* case for reverse discrimination showing: (1) that the Defendant "is that unusual employer who discriminates against the majority;" (2) that they were qualified for the position in question; (3) that they suffered an adverse employment action when they were not promoted; and (4) that they were treated differently than similarly situated employees. *Arendale v. City of Memphis,* 519 F.3d 587, 603–04 (6th Cir.2008). If Plaintiffs make out their *prima facie* case, the burden shifts to Defendants to show a legitimate, non-discriminatory reason behind their actions. *Id.* at 603. Once Defendants meet their burden, Plaintiffs must prove that the stated explanation was a pretext for discrimination. *Id.*

### a. Background Circumstances

Establishing the first prong of the *prima facie* case in a reverse discrimination claim requires Plaintiffs to show that Defendants are that "unusual employer who discriminates against the majority." *Id.* at 603–04. This requirement is not onerous, and can be met through a variety of means, such as statistical evidence; employment policies demonstrating a history of unlawful racial considerations; evidence that the person responsible for the employment decision was a minority; or general evidence of ongoing racial tension in the workplace. *See Treadwell v. Am. Airlines,* 447 Fed.Appx. 676, 678 (6th Cir.2011) (citing cases). Indeed, "the mere fact that a racial minority took an adverse action" against the employee is often sufficient to satisfy the background circumstances requirement. *Leavey v. City of Detroit,* 467 Fed.Appx. 420, 425 (6th Cir.2012) (citing *Arendale,* 519 F.3d at 603).

[5] Plaintiffs allege that a background of reverse discrimination may be inferred from: (1) the 2003 Anderson memo; (2) the statements made by Commander Nash, Chief Pike, and HR representative Sinor in the meetings Plaintiffs requested after being passed over for promotion; (3) the fact that Serpas was "chief for a political entity" and motivated to "appease the population of Nashville"; and (4) two unrelated discrimination cases brought against Metro.

The district court found this evidence insufficient to prove background circumstances, because there was no evidence to conclude that Defendants' actually unlawfully considered race or gender as factors in the making specific employment decisions. *Johnson III,* 2010 WL 3342211, at *16.

In so reasoning, the district court went too far. The background circumstances element only requires a plaintiff to *"support the suspicion"* that the defendant is that unusual employer who discriminates against the majority;" a plaintiff need not prove that the employer's actions *actually* were illegally motivated. *Boger v. Wayne Cnty.,* 950 F.2d 316, 324–25 (6th Cir.1991) (emphasis added). Requiring Plaintiffs to show actual discrimination at this stage conflates the background circumstances element with the remainder of *McDonnell Douglas'* burden-shifting approach. *See Treadwell,* 447 Fed.Appx. at 679 (noting that requiring a plaintiff to produce both "the foreground and background evidence to reach a jury" incorrectly collapses the background circumstances prong into *McDonnell Douglas'* other elements).

**\*537** As is required on summary judgment, we must draw disputed inferences in Plaintiffs' favor and conclude that Plaintiffs have met the background circumstances element. Plaintiffs supplied sufficient evidence to raise at least a material issue of fact that there was ongoing racial tension within the MNPD, and particularly, tension surrounding the manner in which promotions were being awarded within the department's ranks. *See, e.g., id.* at 678; *Boger,* 950 F.2d at 324–25; *McCloud v. Testa,* 97 F.3d 1536, 1549 (6th Cir.1996); *Zambetti v. Cuyahoga Cmty. College,* 314 F.3d 249, 256 (6th Cir.2002). Plaintiffs presented depositions by persons at all levels of MNPD's hierarchy who testified that the department was interested in promoting diversity and that it was acutely conscious of its long history of racial and gender imbalance.[5] And while the district court was correct that such a focus may only reflect a legitimate desire to comply with equal opportunity requirements, it also presents a context sufficient to meet the background circumstances element.

### b. Qualifications and Similarly Situated Candidates

[6] As to the remaining prongs of Plaintiffs' *prima facie* case, Plaintiffs suffered an adverse employment decision when they were passed over for promotion, but Defendants dispute whether Plaintiffs were qualified for promotion and

similarly situated to the promoted candidates. These prongs touch on essentially the same issues, so we address them together.

Whether Plaintiffs were qualified for promotion and similarly situated to the promoted candidates depends partly upon how we compare the candidates. The district court disregarded the surveys in deciding the qualification issue, but considered them in its similarly situated analysis. We agree with this approach.

Under the new scoring procedure, candidates who received the highest scores were placed on the eligibility roster in alphabetical order without revealing the composite score. We agree with the district court that this procedure meant that all candidates whose names appeared on the roster were deemed qualified for promotion. *Johnson II*, 2010 WL 3342211, at *3. Hence, we need not take into account the candidates' survey scores when considering the qualification element, and we conclude that Plaintiffs have met their burden to prove that they were qualified for promotion.

By contrast, a candidate's score is relevant in deciding whether Plaintiffs were similarly situated to the officers that were selected for promotion. Inclusion on the eligibility roster only qualified a candidate for promotion, but did not guarantee it. Because the chief had the discretion to choose among candidates, a candidate could be passed over for promotion entirely or promoted later than a comparatively lower-scored candidate.

Accordingly, the revised system established a two-stage promotions process. Scoring well on the written and assessment tests was not a guaranteed basis for **\*538** promotion; it only qualified a candidate for promotion. At the second stage, the chief held the sole discretion to choose among candidates. The system did not limit the considerations the chief could take into account, which could conceivably include a wide variety of qualities, including: education, training, length of service, readiness, ability to lead, disciplinary infractions, or a host of other factors. Any of these factors might distinguish Plaintiffs from their promoted peers and render Plaintiffs not similarly situated.

We have explained that in failure-to-promote cases we only require a plaintiff to show that he possesses "similar qualifications" to the employee who received the promotion. *Provenzano v. LCI Holdings, Inc.*, 663 F.3d 806, 814 (6th Cir.2011). During the *prima facie* stage, our inquiry is not

finely distinguished, given that it "is not realistic from a human standpoint" to expect the plaintiff to prove that he has identical qualifications to the chosen candidate. *Id.* Rather, we perform a "more searching evaluation of the relative qualifications of the two candidates" when examining pretext. *Id.* at 816. However, even if we granted leniency to Plaintiffs at the *prima facie* stage, they still have made no effort whatsoever to show that they were similarly situated to the chosen candidates on even the most basic level. Plaintiffs utter failure to address the similarly situated element fatally undercuts their *prima facie* case, as well as their argument for pretext.

Moreover and as noted above, the survey results are appropriately considered when evaluating the similarly situated element. In the instant case, the survey results render Plaintiffs dissimilar from the candidates who were selected for promotion. Serpas ordered the surveys in an effort to capture the supervisors' opinions as to which candidates were most suited for promotion. These opinions were considered, along with each candidate's personnel record and overall qualifications, when Serpas made his promotions decisions. And while Serpas did not take notes about his decisions, he testified that he did draw at least one clear line in his reasoning; he did not promote any candidate whose rollup score fell below a "2.0"

In fact, no candidate was promoted who fell below that line, and Plaintiffs concede that they scored well below this threshold. As such, they were not similarly situated to those candidates chosen for promotion. *See Gaffney v. Potter*, 345 Fed.Appx. 991, 993 (6th Cir.2009) (holding that differences in performance ratings render two employees not similarly situated). Accordingly, Plaintiffs' *prima facie* case fails because they have failed to show that they were similarly situated to the promoted candidates.

### c. Pretext

[7] Although Plaintiffs have not met their *prima facie* burden, we note that similar deficiencies prevent them from demonstrating pretext.

Serpas explained that he did not select Plaintiffs for promotion because of their poor survey results. He testified that the scores demonstrated that those who were familiar with Plaintiffs' qualifications did not believe they would be as "successful" or "ready" for promotion in comparison to

the other candidates. Serpas averred that he did not take race or gender into consideration when deciding whom to promote. Thus, Defendants have provided a permissible, non-discriminatory basis for the adverse employment decision, and Plaintiffs bear the burden of producing a triable issue of fact that the basis was a pretext for reverse discrimination.

We have explained that a closer comparison of candidates is appropriate when the parties dispute whether an employee was **\*539** chosen for promotion based on qualifications versus discriminatory animus. *Provenzano,* 663 F.3d at 816. In conducting our evaluation, we do not act as a " 'super personnel department,' overseeing and second guessing employers' business decisions," *Bender v. Hecht's Dep't Stores,* 455 F.3d 612, 626 (6th Cir.2006), but rather simply compare characteristics such as "[d]ifferences in job title, responsibilities, experience, and work record," in order to make an informed determination about whether an employment decision was based on pretext, *Leadbetter,* 385 F.3d at 691.

As noted above, however, Plaintiffs have provided the Court with none of the information required to draw an informed comparison. Rather, the only pertinent information we have before us shows that both minority and majority candidates with better survey scores were promoted ahead of Plaintiffs. Likewise, candidates with lower survey scores of both races and genders were not selected for promotion. These facts render fatal Plaintiffs' claims of pretext.

Finally, we note that the move to the new promotions procedure was apparently based on a variety of factors. Plaintiffs concede that the test-based promotions method was criticized for a number reasons—one of which was the disadvantage it imposed on minority candidates—but also for other reasons that were not based on race or gender. The MNPD, its officers, and the consulting company that worked on the updated procedure all agreed that the old method did not take into account other factors that critically affected the candidate's suitability for promotion—including length of service, educational background and training, and the opinions of the candidates' supervisors. The fact that the survey instructions mentioned these permissible factors, and not those impermissible factors of race or gender, also undermines Plaintiffs' claims for pretext.

**D. Disparate Impact Claims**

We turn next to Plaintiffs' claims of disparate impact brought under Title VII. "Disparate impact causes of action penalize

employment practices that are 'fair in form but discriminatory in operation.' " *Phillips v. Cohen,* 400 F.3d at 388, 397 (6th Cir.2005) (quoting *Griggs,* 401 U.S. at 431, 91 S.Ct. 849). "Thus, disparate impact analysis is intended to make sure that employers do not use 'neutral' decision-making mechanisms that in fact work to eliminate a greater portion of otherwise-qualified protected group members than they do members of other groups." *Id.* Accordingly, a disparate impact claim does not require a showing of intent to discriminate. *Id.* Instead, the plaintiff must allege that a specific employment practice had an adverse effect on a group of employees, despite its facial neutrality. *Id.*

Disparate impact analysis requires the Plaintiff to identify—with specificity—the particular procedure having an adverse effect. *Dunlap v. TVA,* 519 F.3d 626, 629 (6th Cir.2008). A three-part burden-shifting test is then used to examine a disparate impact claim: (1) the plaintiff must establish a *prima facie* case for discrimination; (2) the employer may then show that the challenged procedure is justified by "business necessity"; and (3) the plaintiff can rebut the employer's justification by showing that other tests or selection protocols would serve the employer's interest without creating the undesirable discriminatory effect. *Albemarle Paper Co. v. Moody,* 422 U.S. 405, 425, 95 S.Ct. 2362, 45 L.Ed.2d 280 (1975).

**1. Procedural Posture**

Before turning to the merits of Plaintiffs' disparate impact claim, we must consider **\*540** its procedural posture and Plaintiffs' argument that the district court improperly denied them leave to amend in order to supplement their disparate impact arguments.

In the instant case, there are three components of the new promotions procedure that Plaintiffs could have alleged caused a disparate impact: (1) the change from the test-based promotions procedure to the eligibility roster procedure; (2) Serpas' unilateral discretion to select candidates for promotion off the roster based on unspecified criteria; and (3) the introduction of the supervisors' subjective opinions by way of the survey results. Of these, and as further explained below, Plaintiffs only alleged the first of the three had a disparate impact.

At the close of discovery, Plaintiffs moved to amend their complaint, in order to allege "all facts as known to

WestlawNext © ... Reuters. No claim to original U.S. Government Works.

13

the plaintiffs as of today with regard to these charges." The additional paragraphs detailed information Plaintiffs learned during the discovery process, including additional details about how the survey process was implemented. However, the motion to amend did not seek to add any additional charges of disparate impact beyond Plaintiffs' original challenge to the eligibility roster procedure.

Accordingly, Plaintiffs never sought to add a claim that Serpas's discretion caused a disparate impact. Likewise, Plaintiffs never claimed that the supervisor surveys caused a disparate impact. Plaintiffs however, did allege that these aspects of the promotions procedure caused a disparate impact in their response to Defendants' motion to dismiss. Plaintiffs' arguments, however, went beyond the strict allegations raised in their proposed amended complaint—that the "sliding-band" procedure caused a disparate impact—and went on to say that "the Captain's surveys and the input from Serpas caused a disparate impact on the promotions favoring minorities over white males."

The district court denied Plaintiffs' motion to amend, noting that the amendment deadline passed two months prior; that Plaintiffs had requested extensions on several other deadlines, but not on the amendment deadline; and that Plaintiffs' filing violated Federal Rule of Civil Procedure 16(b)(4) (requiring good cause to modify a scheduling order) and Local Rule 7.01(a) (requiring the filing of an accompanying memorandum of law where a motion "may require the resolution of an issue of law"). Finally, the court commented that Plaintiffs had already amended their claims multiple times and that the latest reason given—"to allege all facts as known to the plaintiffs as of today with regard to these charges"—was "insufficient to justify a fourth amendment."

Shortly thereafter, the district court granted Defendants' motion to dismiss the disparate impact claim. The district court noted the pleading errors described above and commented that, while "plaintiffs [ ] somewhat convincingly argue[d]" a disparate impact claim related to the surveys, the argument could not be considered because Plaintiffs failed to raise it in their complaint. *See Johnson II, 2008 WL 3163531, at \*6 (citing Kostrzewa v. City of Troy, 247 F.3d 633, 643 (6th Cir.2001)).*

### 2. Denial of Leave to Amend

Rule 15(a)(2) of the Federal Rules of Civil Procedure provides that a court may freely grant leave to amend a pleading when justice so requires, in order to make certain that a case is tried on its merits "rather than [on] the technicalities of the pleadings." *Moore v. City of Paducah, 790 F.2d 557, 559 (6th Cir.1986).* "In deciding whether to grant a motion to amend, courts should consider undue delay in filing, lack of notice to the opposing **\*541** party, and futility of amendment." *Brumbalough v. Camelot Care Ctrs., Inc., 427 F.3d 996, 1001 (6th Cir.2005).* Unless leave was denied on the basis of futility, this Court reviews the district court's decision for abuse of discretion. *Ziegler v. Aukerman, 512 F.3d 777, 786 (6th Cir.2008).*

Rule 15 provides that leave to amend "shall be freely given when justice so requires." Fed.R.Civ.P. 15(a). In the absence of reasons such as those listed above, leave should generally be granted. *Foman v. Davis, 371 U.S. 178, 83 S.Ct. 227, 9 L.Ed.2d 222 (1962).* Nevertheless, a district court retains its discretion on such matters, and provided that the court announces a clear reason for its decision, this Court will generally defer to its reasoning. *Id.*

Rule 15 is augmented by Rule 16, which states that the generally wide latitude to amend may be restricted by the court's other scheduling orders. *See Fed.R.Civ.P. 16(b).* Rule 16 requires that a party seeking to amend outside a scheduling order may do so only on a showing of "good cause." This limitation is "designed to ensure that 'at some point both the parties and the pleadings will be fixed.' " *Leary, 349 F.3d at 906.* In balancing Rules 15 and 16, this Court considers the movant's "diligence in attempting to meet the case management order's deadlines" and "whether the opposing party will suffer prejudice by virtue of the amendment." *Id.*

[8] Plaintiffs contend that the district court abused its discretion when it refused to grant their motion to amend. They contend that the district court unfairly denied the motion solely on procedural technicalities and that, by doing so, it denied them the opportunity to allege facts that "could not have been discovered [ ] without having conducted written discovery." Given that the district court perceived some merit in a disparate impact claim based on the surveys, Plaintiffs contend the court's refusal to allow amendment was in error.

We disagree. Plaintiffs have made no real attempt, either before the district court or before us now, to argue that "good cause" supported an amendment sought over two months after the deadline in the court's scheduling orders. Plaintiffs simply

perfunctorily allege that they could not have discovered the facts required to support their claims before written discovery was conducted. However, Plaintiffs never state with any specificity when the evidence was received or why they could not have met or sought an extension on the district court's original deadline.

We note that the disparate impact claims Plaintiffs now put forth are largely based on information that Plaintiffs appear to have known from the outset of this suit. For instance, as Plaintiffs' own affidavits indicate, they knew that Serpas had total discretion to select candidates for promotions off the eligibility roster, and they knew, or at least discovered shortly after the disputed promotions were announced, that an anonymous supervisor survey had been conducted. Accordingly, Plaintiffs had access to the basic facts required to allege their new disparate impact claims, even if they lacked certain specifics.

Moreover, even if we were to consider the new evidence Plaintiffs sought to add by way of an amended complaint, the fact remains that Plaintiffs failed to expand the legal bases for their disparate impact claims. A close reading of the documents reveals that the district court was correct. Plaintiffs only properly alleged a disparate impact claim based on the eligibility roster method. Although Plaintiffs' response to the motion to dismiss expanded their disparate impact claims, the district court was limited, as are we, to the facts and legal claims as raised in the pleadings. *See* **\*542** Moore's Federal Practice § 12.34. ("The court may not ... take into account additional facts asserted in a memorandum opposing the motion to dismiss, because such memoranda do not constitute pleadings under Rule 7(a)."). Accordingly, the district court did not abuse its discretion in denying Plaintiffs leave to amend.

### 3. Merits Analysis

 [9]    Thus, we are left only to consider the disparate impact claim that was properly before the court—whether the move to the eligibility roster imposed a disparate impact on non-minority, male candidates. The district court rejected the challenge, noting that the complaint "alleged that MNPD ignored the objective criteria it gathered from the written examination and the assessment *because of an intent to discriminate." Johnson II,* 2008 WL 3163531, at \*6 (emphasis added). The district court reasoned that this type of

allegation was more akin to a disparate treatment claim than it was to a disparate impact claim. *Id.* We agree.

Finally, we briefly point out *Ricci v. DeStefano,* 557 U.S. 557, 129 S.Ct. 2658, 174 L.Ed.2d 490 (2009), a case issued by the Supreme Court about a year after the district court dismissed Plaintiffs' disparate impact claim. In *Ricci,* the Supreme Court found that the city of New Haven, Connecticut imposed a disparate impact on certain Caucasian firefighters when it refused to certify examination results when the results failed to produce any minority candidates. The fact that the City changed its procedures during the middle of the promotions process was a key factor in the Supreme Court's decision:

> [Once a promotion process is established] and employers make clear their selection criteria, they may not then invalidate the test results, thus upsetting an employee's legitimate expectation not to be judged on the basis of race. Doing so, absent a strong basis in evidence of an impermissible disparate impact, amounts to the sort of racial preference that Congress disclaims, and is antithetical to the notice of a workplace where individuals are guaranteed equal opportunity regardless of race.

*Id.* at 585, 129 S.Ct. 2658.

To be sure, guidance from *Ricci* might have helped Plaintiffs plead their allegations with requisite specificity, had that case been available to them. However, the present case remains easily distinguishable from *Ricci,* in that there is no evidence to show that Defendants disregarded any valid scores. And while Plaintiffs might have argued that their legitimate expectations were upset by the delayed introduction of the supervisor surveys, as explained above, they failed to properly allege this argument in their complaint. [6]    Accordingly, we affirm the district court's decision dismissing Plaintiffs' disparate impact claim.

### III. Tennessee Human Rights Act

Citing *Gossett v. Tractor Supply Co.,* 320 S.W.3d 777, 779 (Tenn.2010), Plaintiffs next argue that the district court applied an incorrect summary judgment standard to their claims brought under the THRA. In *Gossett,* the Tennessee

Supreme Court reasoned that it was inappropriate to use the *McDonnell Douglas* framework to decide summary judgment motions for claims brought under the THRA, inasmuch as the **\*543** *McDonnell Douglas* framework was incompatible with Tennessee's own summary judgment jurisprudence. However, shortly thereafter, the Tennessee legislature abrogated Gossett by statute. See Tenn.Code Ann. § 4–21–311(e); *see also Bobo v. UPS,* 665 F.3d 741, 757 (6th Cir.2012). Plaintiffs' argument on this point is therefore moot.

## IV. Costs

[10]    The district court awarded Metro the costs of defending both Serpas and Metro against this lawsuit. On appeal, Plaintiffs raise two challenges to this decision. First, Plaintiffs argue that, regardless of the fact that Metro actually paid for Serpas' costs and legal fees, Serpas should have filed a separate bill of costs. Second, they argue that the district court did not carefully scrutinize whether the cost of a second set of transcripts for Serpas' attorneys was truly "necessary."

This Court reviews a district court's award of attorneys costs for abuse of discretion. *Singleton v. Smith,* 241 F.3d 534, 538 (6th Cir.2001). Awards decisions are "fact-intensive" and a trial court's determination of those facts is entitled to substantial deference. *See Imwalle v. Reliance Med. Prods.,* 515 F.3d 531, 551 (6th Cir.2008). Applying this standard, neither of Plaintiffs' arguments have merit.

Federal Rule of Civil Procedure 54(d)(1) provides that "costs other than attorney's fees [ ] should be allowed to the prevailing party." The presumption in favor of awarding costs may only be reversed upon a "heavy showing" that the court abused its discretion. *Baji v. N.E. Reg'l Bd. of Dental Examiners, Inc.,* 3 Fed.Appx. 352, 360 (6th Cir.2001) (citing *White & White, Inc. v. Am. Hosp. Supply Corp.,* 786 F.2d 728, 730 (6th Cir.1986)). In order to award costs to a prevailing party, the court must determine that:

> the expenses are allowable cost items and that the amounts are reasonable and necessary. As long as statutory authority exists for a particular item to be taxed as a cost, [the court] shall not overturn a district court's determination that the cost

is reasonable and necessary, absent a clear abuse of discretion. Thus, we shall review carefully whether an expense is recoverable, but once we determine that it is, we defer to the district court, which is in the best position to determine whether the cost is recoverable.

*Baker v. First Tenn. Bank Nat'l Assoc.,* 142 F.3d 431 (6th Cir.1998) (table) (citing *Northbrook Excess & Surplus Ins. Co. v. Procter & Gamble Co.,* 924 F.2d 633, 642 (7th Cir.1991)).

Rule 54(d) provides that costs "should be allowed to the prevailing party," but it does not specify how to file a bill of costs. The Middle District of Tennessee's Local Rule 54.01 is somewhat more specific and requires that "a cost bill, with supporting documentation, shall be *filed by the prevailing party.*" (emphasis added). However, this rule does not provide that each prevailing party must file separately, and we have found no cases requiring that. Lastly, we note that Plaintiffs did not cite to Local Rule 54.01 before the district court. Accordingly, the district court did not abuse its discretion.

Plaintiffs next argue that the second set of transcripts was not reasonable or necessary, and they fault the district court for failing to carefully scrutinize whether Serpas' attorneys had an individual need for the transcripts. This claim is meritless. The depositions in question—those of Chief Serpas, Deputy Chiefs Pike and Anderson, and Eric Cardinal—were at the core of Plaintiffs' claims of reverse discrimination against Serpas and critical to his defense against those charges. Accordingly, **\*544** the deposition transcripts were necessary and the award of costs was appropriate.

## CONCLUSION

For the reasons stated above, we **AFFIRM** the district court's judgment in all respects.

## Parallel Citations

2012 WL 4945607 (C.A.6 (Tenn.))

Footnotes

*       The Honorable Robert M. Dow, Jr., United States District Judge for the Northern District of Illinois, sitting by designation.

1     The federal claims against the officers were dismissed on the basis of qualified immunity. *Johnson I,* 2008 WL 2066475, at *4. The state claims against the officers were dismissed for insufficiency of the allegations. *Id.* at *8. The claims against MNPD were dismissed because it is not an entity capable of being sued under Tennessee law. *Id.* at *8 n. 5. By state statute, all claims against the MNPD must be pursued against Metro. *Id.*

2     Holley did not assert a disparate impact claim.

3     Officer Holley argues that he was only supervised by ten supervisors in his direct chain of command; therefore, the rollup indicating that he was ranked by thirty-three supervisors is suspect. However, Officer Holley misconstrues the survey instructions, which asked the supervisors to rank any candidate whom they "worked directly with or otherwise [had] personal awareness of the skills, abilities, and knowledge of."

4     The "rubber-stamp" or "cat's paw" theory of liability involves a situation where a supervisor is influenced by another individual who was motivated by an impermissible bias. It is more appropriately dealt with in circumstantial evidence review. *See Arendale,* 519 F.3d at 604.

5     We note the same figure that the consulting company found troubling: that, as of 2003, there were a total of 29 African–American supervisors out of 1,300 sworn MNPD officers. Certainly such a statistic could prompt Defendants to be concerned about the need for greater diversity in the department's ranks.

     To a lesser extent, we also take judicial notice of the newspaper articles reflecting dissatisfaction by both minority and majority officers with MNPD's promotions processes. *See* "Officers Say Metro Police Promotions Policy Unfair," *The Tennessean,* Apr. 2, 2007; "Racial Tensions Escalate—Black & White Cops Feud over Promotions, *Nashville Scene,* Oct. 2, 2003.

6     There remains an outstanding factual dispute as to when the supervisor surveys were introduced into the promotions process. Plaintiffs allege that the surveys were introduced during a delay that followed the announcement of the eligibility rosters; Serpas testified in his deposition, however, that he made the decision to conduct the surveys when the new promotions procedure was announced.

---

**End of Document**          © 2014 Thomson Reuters. No claim to original U.S. Government Works.

WestlawNext © 2014 Thomson Reuters. No claim to original U.S. Government Works.    17

2013 WL 2354065
Only the Westlaw citation is currently available.
United States District Court,
S.D. Ohio,
Eastern Division.

John HILL, Plaintiff,
v.
The OHIO STATE UNIVERSITY
T & L, et al., Defendants.

No. 2:12–cv–984. | May 29, 2013.

**Attorneys and Law Firms**

John Hill, Columbus, OH, pro se.

**Opinion**

### *OPINION AND ORDER*

GREGORY L. FROST, District Judge.

**\*1** This matter is before the Court for consideration of the following filings: a motion to strike (ECF No. 80) filed by Plaintiff, John Hill; a motion to dismiss (ECF No. 33) filed by Defendants The Ohio State University Trademark & Licensing, Richard A. Van Brimmer, The Ohio State University Marching Band, and Jon R. Woods ("The OSU Defendants"); a memorandum in opposition (ECF No. 54) filed by Hill; and a reply memorandum (ECF No. 67) filed by the OSU Defendants. For the reasons that follow, the Court **DENIES** the motion to strike (ECF No. 80) and **GRANTS** the motion to dismiss (ECF No. 33).

### I. Background

According to the Amended Complaint, Plaintiff, John Hill, is the holder of multiple copyrights. Several of the copyrights are of The Ohio State University Marching Band uniform design and the remaining copyrights are for other marching band or drum corps uniforms from other institutions. Hill wants to start a business in Ohio in which he would incorporate the various marching band uniforms into what he describes as useful articles. He alleges that various defendants have acted to thwart his efforts. These efforts present two basic sets of facts: one centering around The Ohio State University and one centering around the Garfield Cadets.

In 1986, Hill allegedly approached The Ohio State University Band Director Dr. Jon Woods and the band's alumni group with a tee shirt that incorporated Hill's copyrighted Marching Band Uniform design. Hill avers that his efforts only met with restrictive tactics by these parties used to deter the marketing of his design. He has approached various defendants since 1989 about the use of his designs, but he has been unable to obtain a license for his products since approximately 1990.

Hill began to apply his designs on useful articles in 2005. He also designed a sweater vest bottle koozie in 2006 to 2007, which he presented via a mutual friend to the wife of The Ohio State University's former football coach. During this same period of time, Hill was introduced to Defendants Hollywood Imprints LLC, Bradley Doss, and Davidee Doss ("the Hollywood Imprints Defendants"). Hill alleges that he and these parties entered into a relationship in which he was able to print his products while working at Hollywood Imprints LLC.

In 2006, Hill then reportedly entered into an agreement with The Ohio State University Marching Band in which they would purchase koozies to sell. Woods subsequently allegedly called Hill to halt the purchase order and told Hill that the band would later re-order. Years passed without another order occurring. Meanwhile, The Ohio State University continued to produce products that Hill asserts infringe on his copyrights. At least some of the same stores that sold these products declined to carry Hill's products, which Hill characterizes as additional evidence of an overarching conspiracy against him.

In addition to approaching The Ohio State University, Hill also purportedly approached George Hopkins, the Director of the Garfield Cadets, with a tee shirt using a copyrighted design related to that particular group in 1988. In 1989, Hill then acquired a vendor's license to market his designs at various shows throughout Ohio. He pleads that "[o]nly one show was attended, due to rain and other circumstances." (ECF No. 10 ¶ 6.) In addition to the weather hindering his entrepreneurial efforts, Hill encountered a cease and desist letter from Youth Education in the Arts, Inc. (identified in Hill's pleading as "The Cadets—YEA!") and Hopkins sometime in the late 1980's or early 1990's. This resulted in Hill electing not to sell or promote his products, although Hill has continued his attempts to persuade Youth Education in the Arts, Inc. and Hopkins to sell his products when he has been contacted in fundraising efforts by those

entities. In 2004 and again in 2011, Hill contends that he discovered evidence of Youth Education in the Arts, Inc. selling products that infringed on his copyright.

**\*2** Proceeding *pro se*, Hill filed the instant action in October 2012. In his Amended Complaint (ECF No. 10), which must necessarily be read in conjunction with a list of defendants generally identified by numbers in his pleading (ECF No. 9), Hill apparently asserts five claims related to the foregoing allegations of copyright infringement and breach of contract. The OSU Defendants have filed a motion to dismiss all of the claims against them. (ECF No. 33.) Hill has also filed a motion to strike the OSU Defendants' related reply memorandum. (ECF No. 80.) Briefing has closed on both of the motions, which are ripe for disposition. [1]

## II. Discussion

### A. Motion to Strike

In his motion to strike, Hill asks this Court to strike the OSU Defendants' reply memorandum (ECF No. 67), which they filed in support of their motion to dismiss (ECF No. 33). He also seeks costs and attorney's fees. Nowhere in his motion, however, does Hill provide this Court with any substantive reason why the reply memorandum is impermissible. Rather, he simply asserts at some length that he disagrees with the contentions set forth in the reply memorandum. This is an insufficient basis for striking a document. Accordingly, the Court **DENIES** Hill's motion to strike. (ECF No. 80.)

### B. Motion to Dismiss

### 1. Standard Involved

The OSU Defendants move for dismissal on the grounds that Hill has failed to set forth claims upon which this Court can grant relief. This Federal Rule of Civil Procedure 12(b)(6) argument requires the Court to construe Hill's amended complaint in his favor, accept the factual allegations contained in that pleading as true, and determine whether the factual allegations present any plausible claim. *See Bell Atlantic Corp. v. Twombly,* 550 U.S. 554, 570 (2007). The Supreme Court has explained, however, that "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions." *Ashcroft v. Iqbal,* 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009). Thus, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements,

do not suffice." *Id.* Consequently, "[d]etermining whether a complaint states a plausible claim for relief will ... be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.* at 679.

To be considered plausible, a claim must be more than merely conceivable. *Twombly,* 550 U.S. at 556; *Ass'n of Cleveland Fire Fighters v. City of Cleveland, Ohio,* 502 F.3d 545, 548 (6th Cir.2007). What this means is that "[a] claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal,* 556 U.S. at 678. The factual allegations of a pleading "must be enough to raise a right to relief above the speculative level...." *Twombly,* 550 U.S. at 555. *See also Sensations, Inc. v. City of Grand Rapids,* 526 F.3d 291, 295 (6th Cir.2008).

### 2. Analysis

**\*3** The OSU Defendants seek dismissal on the grounds that Hill has failed to set forth claims against them upon which this Court can grant relief. This Court agrees.

Similar to its treatment of other defendants in this litigation, the Amended Complaint fails to allege facts presenting plausible claims against the OSU Defendants. Instead, Hill has once again pled conclusory allegations against defendants without pleading the critical facts that, necessarily taken as true in this context, would present plausible claims. The OSU Defendants carefully explain in their briefing the elements of each claim that Hill apparently alleges and then note how Hill has failed to present facts targeting those elements. This Court need not repeat such detailed analysis here because the same fundamental flaw pervades every claim at issue, regardless of the varied elements: Hill has failed to tell this Court and the parties what acts any defendant has purportedly done.

What this means is that none of the Amended Complaint paragraphs present facts that suggest conspiracy, unfair competition, copyright infringement, or any of the other claims for relief Hill might be pursuing such as Hill's unexplained reference to counterfeiting. Hill has simply failed to tell this Court and the defendants in this litigation what specific improper acts any defendant has done.

For example, in paragraph three of the Amended Complaint, Hill pleads factual allegations targeting his interest in his asserted copyrights. Paragraph four then asserts that Defendant Woods and other unidentified individuals employed tactics against Hill to deter Hill's marketing of

his design. What is missing from this pleading chain is the substance; Hill has only pled a set-up and a conclusion. He fails to assert facts leading to his conclusion.

This same fundamental flaw pervades paragraphs thirteen through twenty-one. In these paragraphs, Hill asserts that he attempted to obtain a license to market his designs, only to meet with refusals by select OSU Defendants. But Hill fails to provide factual details that taken as true could present plausible claims. The closest he comes at detailing possibly relevant facts as opposed to making only conclusory allegations is when he asserts that the OSU Marching Band placed an order for koozies and then improperly cancelled the order. But there is no state law breach of contract claim asserted in this case. There is instead an assertion of a "Contracts to Interference" claim, which Hill bases on 28 U.S.C. § 2680 (which does not present such a claim for relief) and 28 U.S.C. § 2822 (which does not exist).

The OSU Defendants are correct in asserting that, in light of such shortcomings and other deficiencies, the Amended Complaint violates Federal Rule of Civil Procedure 10(b). Even setting aside the abundant technical violations and affording the *pro se* Hill the benefit of the doubt, his pleading fails due to its lack of substance. Regardless of whether the Amended Complaint is read to assert five claims or possibly eight (at times citing statutes that do not exist), with a suggestion of other unidentified claims, the point is that Hill has failed to allege any facts indicating any wrongdoing by the OSU Defendants. He does not point to any specific allegedly infringing items or any specific conspiratorial actions, and he certainly does not present with the requisite particularity any fraudulent representations related to his claims. Hill has instead alleged only his beliefs, which is precisely the type of speculative pleading that *Twombly* and *Iqbal* reject. Absent factual content in the Amended Complaint that allows this Court to draw the reasonable inference that the OSU Defendants are liable for the misconduct alleged in any of the claims Hill asserts, the claims lack facial plausibility.

**\*4** In his memorandum in opposition, Hill responds to the OSU Defendants' motion by stating that he "is still waiting to hear what happened." (ECF No. 54, at PAGEID # 360.) He improperly places the onus on the OSU Defendants to set forth their conduct, either without recognizing or accepting that it is his job as a plaintiff to tell them and this Court what allegedly happened. Hill also summarizes his pleading and at times adds factual allegations in his memorandum that were not set forth in the Amended Complaint. This Court has explained previously in regard to the other motions to dismiss in this case that such an approach is unacceptable. A plaintiff cannot salvage an insufficient complaint by attempting *de facto* amendment of that pleading via a response brief to a motion to dismiss. *See United States v. Medquest Assocs., Inc.,* 702 F.Supp.2d 909, 918 n. 2 (M.D.Tenn.2010); *Newsom v. Xenia City Sch. Dist. Bd. of Educ.,* No. C–3–95–173, 1996 WL 1089065, at \*2 (S.D.Ohio Mar.25, 1996). Rather, in considering a motion to dismiss, a court is "limited ... to the facts and legal claims as raised in the pleadings." *Johnson v. Metro. Gov't of Nashville & Davidson Cnty., Tenn.,* 502 F. App'x 523, 541–42 (6th Cir.2012) (" 'The court may not ... take into account additional facts asserted in a memorandum opposing the motion to dismiss, because such memoranda do not constitute pleadings under Rule 7(a).' ' (quoting Moore's Federal Practice § 12.34)). Hill is therefore stuck with his Amended Complaint in regard to the instant motion to dismiss. That pleading fails to satisfy a Rule 12(b)(6) analysis.

### III. Conclusion

For the foregoing reasons, the Court **DENIES** Hill's motion to strike (ECF No. 80) and **GRANTS** the OSU Defendants' motion to dismiss (ECF No. 33).

**IT IS SO ORDERED.**

Footnotes

1    The briefing presents an unusual example of apparent precognitive litigating. The OSU Defendants filed their motion to dismiss on February 6, 2013. (ECF No. 33.) The previous month, however, Hill had filed a document he characterized as a memorandum in opposition (ECF No. 25) to the OSU Defendants' motion to dismiss; a few days later, he then supplemented that memorandum (ECF No. 27). It is unclear to this Court how Hill was responding to a motion in January 2013 that had not been filed and served upon him until February 2013. The Court has disregarded the premature responses and has considered the memorandum in opposition that Hill filed after the filing of the motion to dismiss. (ECF No. 54.)

WestlawNext

3

**End of Document**                    © 2014 Thomson Reuters. No claim to original U.S. Government Works.

WestlawNext © 2014 Thomson Reuters. No claim to original U.S. Government Works.    4

2013 WL 275900
Only the Westlaw citation is currently available.
United States District Court,
S.D. California.

Almut REINICKE, Plaintiff,

v.

CREATIVE EMPIRE, LLC, dba
Mangolanguages.com, a Michigan Limited Liability
Company; and Does 1–10, inclusive, Defendants.

No. 12cv1405–GPC(KSC).    |
Dkt. No. 4.    |    Jan. 24, 2013.

**Attorneys and Law Firms**

John Boyce, Jr., Attorney at Law, Encinitas, CA, for Plaintiff.

Elliot B. Gipson, Gregory A. Fayer, Minh Zhen Kuo, Fayer
Gipson LLP, Los Angeles, CA, for Defendants.

**Opinion**

**ORDER GRANTING IN PART AND DENYING IN
PART DEFENDANT'S MOTION TO DISMISS AND
MOTION FOR A MORE DEFINITE STATEMENT**

GONZALO P. CURIEL, District Judge.

 **\*1**  Before the Court is Defendant Creative Empire LLC's
motion to dismiss and motion for a more definite statement.
(Dkt. No. 4.) Plaintiff filed an opposition on November 30,
2012. (Dkt. No. 12.) Defendant filed a reply on December 14,
2012. (Dkt. No. 13.) The motions are submitted on the papers
without oral argument pursuant to Civil Local Rule 7.1(d)(1).
After a review of the briefs, supporting documentation, and
applicable law, the Court GRANTS in part and DENIES in
part Defendant's motion to dismiss and motion for a more
definite statement.

**Background**

On June 11, 2012, Plaintiff Almut Reinicke filed
a complaint against Defendant Creative Empire, LLC
dba mangolanguages.com alleging copyright infringement,
conversion and quantum meruit. (Dkt. No. 1, Compl.)
Defendant has an online language learning software
commonly known and distributed over the Internet as Mango

2 .0. (Id. ¶ 1.) It provides a online text content language
learning services. (Id. ¶¶ 7, 9.)

Plaintiff is a native German speaker and Defendant contracted
with Plaintiff to create a "specific online text content for the
German language learning services that were part of Mango
2.0." (Id. ¶ 10.) Plaintiff used her creative skills so students
using the Mango 2.0 language learning services would
complete the German language program and be conversant,
able to read and understand basic German writings, and be
able to communicate in writing in German. (Id.)

Plaintiff alleges that the text content constitutes the creative
Work created and owned by Plaintiff. Plaintiff registered her
Work entitled "Almut Reincke Mango German Course I"
with the United States Copyright Office. [1]  (Id.)

The Work consists of 10 chapters with specific conversational
and grammatical goals for each chapter. (Id. ¶ 11.) Each
chapter includes detailed instructions on proper grammar and
contain grammar and cultural notes that provide the necessary
context for the content contained in the particular chapter.
(Id.) Plaintiff also created supplemental materials for use in
the Mango 2.0 German course which provided students with
phonetic spellings of German words. (Id.)

Plaintiff alleges she was an independent contractor with
Defendant and was never an employee. (Id. ¶ 12.) The terms
for Plaintiff's creation of the Work were not contained in a
written agreement between the parties. (Id.) Defendant paid
Plaintiff a nominal sum for the substantial time and effort to
create the Work and did not pay the reasonable value for her
services. (Id.)

Despite the fact that Defendant did not own the copyright to
the Work, it incorporated the Work into its online language
learning services for Mango 2.0 since November 2010. (Id. ¶
13.) Defendant has marketed and sold the Work online via the
website and continues to do so. (Id. ¶ 13.) It has also used the
Work at conferences and trade shows and has received great
profit and benefit from the Work. (Id.)

**Discussion**

 **\*2**  Defendant moves to dismiss, pursuant to Federal Rule
of Civil Procedure 12(b)(6), Plaintiff's second claim for relief
for conversion, third claim for relief for quantum meruit,
prayer for relief for punitive damages, statutory damages and

attorney's fees in connection with its first claim for relief of copyright infringement. Defendant also moves for a more definite statement pursuant to Federal Rule of Civil Procedure 12(e) as to the first claim of relief for copyright infringement.

**A. Legal Standard for Federal Rule of Civil Procedure 12(b) (6)**

Federal Rule of Civil Procedure 12(b)(6) permits dismissal for "failure to state a claim upon which relief can be granted." Fed.R.Civ.P. 12(b)(6). Dismissal under Rule 12(b)(6) is appropriate where the complaint lacks a cognizable legal theory or sufficient facts to support a cognizable legal theory. *See Balistreri v. Pacifica Police Dep't.,* 901 F.2d 696, 699 (9th Cir.1990). A complaint may survive a motion to dismiss only if, taking all well-pleaded factual allegations as true, it contains enough facts to "state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal,* 556 U.S. 662, 129 S.Ct. 1937, 1949, 173 L.Ed.2d 868 (2009) (*quoting Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* "In sum, for a complaint to survive a motion to dismiss, the non-conclusory factual content, and reasonable inferences from that content, must be plausibly suggestive of a claim entitling the plaintiff to relief." *Moss v. U.S. Secret Serv.,* 572 F.3d 962, 969 (9th Cir.2009) (quotations omitted). In reviewing a Rule 12(b) (6) motion, the Court accepts as true all facts alleged in the complaint, and draws all reasonable inferences in favor of the plaintiff. *al-Kidd v. Ashcroft,* 580 F.3d 949, 956 (9th Cir.2009).

**B. Second Cause of Action–Conversion**

Defendant alleges that the conversion claim is preempted by the Copyright Act. In opposition, Plaintiff does not appear to challenge Defendant's argument. She states that if the remedies available to Plaintiff under a claim for conversion are limited to a return of her personal property—the "Work, then Plaintiff will accept this remedy, and take back her property from Defendant." (Dkt. No. 12, P's Opp. at 6.) She further states that since judgment under this claim would not provide compensation for wrongful use of the Work, then if conversion is preempted, then it will seek remedies for damages under copyright infringement.

The Copyright Act preempts any other "legal or equitable rights that are equivalent to any of the exclusive rights within the general scope of copyright." 17 U.S.C. § 301(a). Section 301(a) preempts a state-created right if that right "may be abridged by an act which, in and of itself, would infringe one of the exclusive rights [listed in § 106]." *Oddo v. Ries,* 743 F.2d 630, 635 (9th Cir.1984) (citation omitted). However, there is no preemption if violation of the state right is "predicated upon an act incorporating elements beyond mere reproduction or the like." *Id .*

**\*3** Two conditions must be met for preemption of state law claims under the Copyright Act. "First, the content of the protected right must fall within the subject matter of copyright as described in 17 U.S.C. §§ 102 and 103. Second, the right asserted under state law must be equivalent to the exclusive rights contained in section 106 of the Copyright Act." *Sybersound Records, Inc. v. UAV Corp.,* 517 F.3d 1137, 1150 (9th Cir.2008) (*citing Downing v. Abercrombie & Fitch,* 265 F.3d 994, 1003 (9th Cir.2001)). A conversion claim is preempted under the Copyright Act when the claim is based on rights protected under the Act, such as the publishing, reproduction, adaptation of copyrighted material, not when the claim is based merely on possession of said material or violation of other rights not covered under the Act. *Seng —Tiong Ho v. Taflove,* 648 F.3d 489, 502 (7th Cir.2011) ("The conversion claim, then, is focused on the defendants' unauthorized publishing, not possession, of the protected work. Because publishing is a right under the Copyright Act, the conversion claim is preempted."); *Daboub v. Gibbons,* 42 F.3d 285, 289 (5th Cir.1995) (A claim for conversion will be preempted when the theory of recovery merely asserts the wrongful copying, distribution, or performance of an interest under the Copyright Act.); *A Slice of Pie Productions, LLC v. Wayans Bros. Ent.,* 392 F.Supp.2d 297, 317 (D.Conn.2005) ("[E]ven a viable conversion claim would be preempted by the Copyright Act since it is based solely on copying, i.e. wrongful use, not wrongful possession.")

The Complaint alleges that Plaintiff was contracted with Defendant to create the "specific online text content for the German language learning services that were part of Mango 2.0." (Dkt. No. 1, Compl.¶ 10.) Although Plaintiff alleges that the Work constitutes material that is the personal property of Plaintiff, she claims that Defendant converted her property "by using and misappropriating the Work" into its "online language learning services for Mango 2.0 which Mango has marketed and sold online." (*Id.* ¶¶ 13, 22, 24.) Plaintiff's theory of recovery is based on an intangible property, the

alleged infringing distribution and sale of the Mango 2.0 software through the Internet.

Accordingly, the Court concludes that Plaintiff's second cause of action for conversion is preempted by the Copyright Act and GRANTS Defendant's motion to dismiss the second cause of action for conversion.

## C. Third Cause of Action—Quantum Meruit

Defendant argues that the claim for quantum meruit must be dismissed as it is also preempted by the Copyright Act. Plaintiff contends that although Defendant unilaterally changed the terms of payment, there was always the promise that Plaintiff would share in the profits of the Mango 2.0 language learning course.

"Quantum meruit (or quasi-contract) is an equitable remedy implied by the law under which a plaintiff who has rendered services benefitting the defendant may recover the reasonable value of those services when necessary to prevent unjust enrichment of the defendant." *In re De Laurentiis Ent. Group Inc., 963 F.2d 1269, 1272 (9th Cir.1992)* (*citing* B. Witkin, Summary of California Law: Contracts § 91 (1987)). "Quantum meruit is not the same as a contract implied in fact. Quantum meruit is based not on the intention of the parties, but rather on the provision and receipt of benefits and the injustice that would result to the party providing those benefits absent compensation." *Id.*

 *4 As discussed above, two conditions must be met to apply the preemption provision under the Copyright Act. *See Sybersound Records, Inc., 517 F.3d at 1150*. First, the content must fall within the subject matter of the Copyright Act. *Id.* Second, the right asserted under state law must be equivalent to the exclusive rights contained in section 106 of the Copyright Act. *Id.*

In one case, the district court held that Plaintiff's claim for quantum meruit was preempted by the Copyright Act. *Lewis v. Activision Blizzard, Inc., 2012 WL 5199505, *2 (N.D.Cal.2012)*. Plaintiff was employed with Defendant, a multiplayer online role-playing game developer, in a customer service position for in-game issues. *Id.* at 1. While employed, Plaintiff responded to an email requesting voices for game creatures. *Id.* Defendant recorded her voice and an original song she allegedly developed and applied her vocal work to WoW creatures called baby murlocs, which are virtual pets. Plaintiff alleges that baby murloc pets using her voice and derivatives have been awarded to attendees

of BlizzCon and other WoW-related events and Defendant sold plush versions of baby murlocs through its online store. *Id.* Plaintiff filed an application for copyright registration for her work in baby murloc expressions and the baby murloc song. *Id.* She alleged that she was not employed by Defendant to produce creative content, did not receive additional compensation for her creative work and did not assign any rights in copyright to Defendant. *Id.* She alleged claims for copyright infringement and quantum meruit. *Id.* The Court held that the quantum meruit claim was preempted by the Copyright Act because her quantum meruit recovery was based on seeking compensation for Defendant's alleged use of her voice recordings which was equivalent to her rights under copyright law. *Id.* at 4.

In this case, Plaintiff is seeking compensation for the creation of the Work [2], which is not a right contained in section 106 of the Copyright Act, and Defendant's alleged commercial use though selling copies of her Works to the public, which is a right contained in section 106 of the Copyright Act. (Dkt. No. 1, Compl.¶ 12.)

Accordingly, the Court GRANTS Defendant's motion to dismiss the quantum meruit claim as it is preempted by the Copyright Act to the extent that the allegation is based on Defendant's sale of copies of Plaintiff's Work to the public. The Court DENIES Defendant's motion to dismiss the quantum meruit claim to the extent it alleges it seeks compensation for the creation of the Work.

## D. Punitive Damages as to Copyright Infringement Claim

Plaintiff contends that punitive damages must be dismissed because punitive damages are not available under the Copyright Act. Defendant contends that punitive damages are allowable and cites to *TVT Records v. Island Def Jam Music Group, 262 F.Supp.2d 185, 186–87 (S.D.N.Y.2003)* (punitive damages may be available if requisite malice is demonstrated and plaintiff has elected to recover actual damages, not statutory damages).

 *5 Punitive damages are not available under the Copyright Act. 17 U.S.C. § 504 (authorizing actual or statutory damages for copyright infringement); *Oboler v. Goldin, 714 F.2d 211, 213 (2d Cir.1983)*. Numerous district court cases in the Ninth Circuit has followed this holding. *Krisel v. Contempo Homes, Inc., 2006 WL 5668181, *3 (C.D.Cal.2006)*; *Smith & Hawken, Ltd. v. Gardendance, Inc., 2004 WL 2496163, *

10 (N.D.Cal.2004); *Saregama India Ltd. v. Young,* 2003 WL 25769784, *1 (C.D.Cal.2003).* The Court follows the district courts in this Circuit that hold that punitive damages are not available under the Copyright Act.

Accordingly, the Court GRANTS Defendant's motion to dismiss the prayer for relief of punitive damages in the First Cause of Action for Copyright Infringement.

### E. Statutory Damages and Attorneys' Fees as to Copyright Infringement Claim

Defendant argues that statutory damages and attorney's fees must be dismissed because those damages are not available based on the allegations in the Complaint. Plaintiff does not address or oppose this argument.

17 U.S.C. § 412 provides that there is no award for statutory damages or attorney's fees for

> (1) any infringement of copyright in an unpublished work commenced before the effective date of its registration; or (2) any infringement of copyright commenced after first publication of the work and before the effective date of its registration, unless such registration is made within three months after the first publication of the work.

17 U.S.C. § 412.

According to the Complaint, Plaintiff "has filed a copyright registration application with the United States Copyright Office for the Work." (Dkt. No. 1, Compl.¶ 16.) The Complaint also states that "Plaintiff has registered her Work entitled 'Almut Reinicke Mango German Course I' with the United States Copyright Office. (*Id.* ¶ 10.) It is not clear from the Complaint whether the Work has been registered and if so, the effective date of the registration. Accordingly, the Court GRANTS Defendant's motion to dismiss the prayer for relief for statutory and attorney's fees under the first cause of action.

### F. Legal Standard for a Motion for a More Definite Statement

Federal Rule of Civil Procedure 12(e) provides that:

> [a[ party may move for a more definite statement of a pleading to which a

responsive pleading is allowed but which is so vague or ambiguous that the party cannot reasonably prepare a response. The motion must be made before filing a responsive pleading and must point out the defects complained of and the details desired.

Fed.R.Civ.P. 12(e). "A motion for a more definite statement is used to attack unintelligibility, not mere lack of detail, and a complaint is sufficient if it is specific enough to apprise the defendant of the substance of the claim asserted against him or her." *San Bernardino Pub. Employees Ass'n v. Stout,* 946 F.Supp. 790, 804 (C.D.Cal.1996). A motion for a more definite statement should be denied "where the information sought by the moving party is available and/or properly sought through discovery." *Famolare, Inc. v. Edison Bros. Stores, Inc.,* 525 F.Supp. 940, 949 (E.D.Cal.1981).

### 1. First Cause of Action for Copyright Infringement

*6 Defendant seeks a more definitive statement as to the allegation in the first cause of action for copyright infringement. First, it seeks specific information as to whether Plaintiff owns a valid copyright registration. Second, the Complaint fails to describe the Work with sufficient particularity to identify it. Third, the Complaint fails to allege what portions of the Work that Defendant has allegedly infringed and how such infringement occurred. Lastly, the Complaint alleges that Plaintiff demanded that Defendant stop its infringing use of Plaintiff's copyrights materials but fails to identify dates or time period when the demand was made. Plaintiff opposes this motion arguing that there is sufficient facts in the complaint to put Defendant on notice as to the substance and scope of Plaintiff's claims.

To establish an infringement of a copyright claim, Plaintiff must show "(1) ownership of a valid copyright, and (2) copying of constituent elements of the work that are original." *Benay v. Warner Bros. Ent., Inc.,* 607 F.3d 620, 624 (9th Cir.2010). "Ownership consists of: (1) originality in the author; (2) copyrightability of the subject matter; (3) a national point of attachment of the work, such as to permit a claim of copyright; (4) compliance with applicable statutory formalities." *Four Navy Seals v. Associated Press,* 413 F.Supp.2d 1136, 1147 (S.D.Cal.2005) (citing Melville B. Nimmer & David Nimmer, Nimmer on Copyright, § 13.01 at 13–4 2005). In *Four Navy Seals,* the Court granted Defendants' motion for a more definite statement under Rule 12(e) because the copyright holder did not state ownership of

a valid copyright in a particular photograph. *Id.* at 1148. In this case, Plaintiff alleges she filed a copyright registration application with the U.S. Copyright Office. (Compl.¶ 16.) It also states that she has registered the Work with the Copyright Office. (*Id.* ¶ 10.) However, she does not indicate whether the copyright was registered and when it was registered which is a element of establishing ownership in a copyright infringement claim. Accordingly, the Court GRANTS Defendant's motion for a more definite statement as to this allegation.

As to the contentions that the Complaint fails to allege a description of the Work with sufficient particularity to identify it and fails to allege what portions of the Work that Plaintiff has allegedly infringed, these are without merit. Plaintiff asserts that Defendant have misappropriated the entire Work consisting of 10 chapters. The Work consists of the "online text content for the German language learning services." (Dkt. No. 1, Compl.¶ 10.) As to the allegation that Plaintiff failed to state when it made its demand on Defendant to stop using her Work, those are facts that can be obtained in discovery and need not be pled in the Complaint.

Accordingly, the Court GRANTS Defendant's motion for a more definite statement as to whether she has ownership of a valid copyright. The Court DENIES Defendant's motion for a more definite statement as to the remaining arguments.

## Conclusion

**\*7** Based on the above, the Court GRANTS in part and DENIES in part Defendant's motion to dismiss and motion for a more definite statement. Specifically, the Court GRANTS

Defendant's motion to dismiss 1) the second cause of action for conversion as preempted by the Copyright Act; 2) the third cause of action for quantum meruit as preempted by the Copyright Act to the extent Plaintiff seeks damages based on Defendant's sale of copies of Plaintiff's Work to the public; 3) the punitive damages prayer for relief as to the first cause of action; 4) the statutory and attorney's fees prayer for relief as to the first cause of action. The Court DENIES Defendant's motion to dismiss the quantum meruit claim to the extent the Complaint alleges it seeks compensation for the creation of the Work.

The Court also GRANTS Defendant's motion for a more definite statement as to the first cause of action as to copyright infringement concerning whether the Work has been registered and when it was registered. The Court DENIES Defendant's motion for a more definite statement as to the claim that the Complaint fails to describe the Work with sufficient particularity to identify it, fails to allege what portions of the Work that Defendant has allegedly infringed and how such infringement occurred, and fails to identify when Plaintiff demanded Defendant to stop infringing her Work.

Plaintiff shall file an amended complaint no later than thirty (30) days from the date stamped on this order curing the deficiencies of pleading identified above.

IT IS SO ORDERED.

## Parallel Citations

2013 Copr.L.Dec. P 30,375

---

Footnotes

1    Later in the Complaint, Plaintiff states the she has filed a copyright registration application with the U.S. Copyright Office. (Compl.¶ 16.) It is not clear whether the Work is registered with the U.S. Copyright Office.

2    Defendant argues that because Plaintiff received a nominal payment for the Work, it cannot state a claim for quantum meruit. The Court does not agree with Defendant's argument.

---

**End of Document**                                   © 2014 Thomson Reuters. No claim to original U.S. Government Works.